## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**WAYNE E. PULLINS, et al.,**

        **Plaintiffs,**

-v-

**LAURA KLIMLEY, et al.,**

        **Defendants.**

        **Case No. 3:05-CV-082**

        **Judge Thomas M. Rose**

_____

### ENTRY AND ORDER GRANTING IN PART AND OVERRULING IN PART BROOKS KLIMLEY'S MOTION FOR SUMMARY JUDGMENT (Doc. #106); GRANTING IN PART AND OVERRULING IN PART LAURA KLIMLEY'S MOTION FOR SUMMARY JUDGMENT (Doc. #108); AND OVERRULING PLAINTIFFS' MOTION FOR ORAL ARGUMENT (Doc. #154)

_____

The Plaintiffs in this matter are Wayne E. Pullins ("Ed"), his wife Dianne H. Pullins ("Dianne") and their son David E. Pullins ("David"). Robert Howard is also a named Plaintiff. The Defendants are Laura Klimley ("Laura") and her husband Brooks Klimley ("Brooks").

Plaintiffs' original Complaint was filed in the Court of Common Pleas for Clark County, Ohio on January 26, 2005, and was subsequently removed to this Court by Laura. Erma A. Houser was a named Plaintiff in the original Complaint and Alicia Eimicke ("Alicia"), Maxine Eimicke ("Maxine"), and John Palmero were named Defendants in addition to Laura. Brooks was not identified as a Defendant in the original Complaint. The original Complaint included causes of action for engaging in a pattern of corrupt activity under Ohio law, fraud, civil conspiracy, and violation of Ohio's Blue Sky laws.

On July 22, 2005, the Plaintiffs filed an Amended Complaint which added claims of

violation of Sections 12(a)(1) and 12(a)(2) of the Securities Act of 1933 and violation of Section 10b of the Securities Exchange Act of 1934. The Amended Complaint also brought the claim of engaging in a pattern of corrupt activity under federal law instead of state law.

On November 2, 2005, the Plaintiffs again amended their Complaint. The Second Amended Complaint includes the same Parties and causes of action as the First Amended Complaint and indicates that it was filed pursuant to the instructions of the United States Bankruptcy Court for the Southern District of New York.

Following and pursuant to this Court's ruling on Defendants' Motion To Dismiss the Second Amended Complaint, the Third Amended Complaint (the "TAC") was filed on April 6, 2006. The TAC does not include Erma A. Houser as a Plaintiff. The TAC also adds Brooks as a Defendant and does not name Alicia, Maxine, and John Palmero as Defendants. Finally, the TAC includes the particulars of the allegations of fraud. It is the TAC that is now before the Court.

Plaintiffs' First Cause of Action in the TAC is a claim brought pursuant to Section 12(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(1), which prohibits selling unregistered securities. The First Cause of Action also includes a claim brought pursuant to Section 12(a)(2) of the Securities Act of 1933 which prohibits the offer or sale of securities through a "prospectus or oral communication" that contains misrepresentations or omissions. 15 U.S.C. § 77l(a)(2).

Plaintiffs' Second Cause of Action is a claim brought pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. This claim is brought specifically pursuant to 15 U.S.C. § 78j and the associated regulation, 17 C.F.R. § 240.10b-5 (the "10b-5 claim"). Together, this code and regulation prohibit making material misstatements in connection with the purchase

or sale of securities.

Plaintiffs' Third Cause of Action is for violation of Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o, and Plaintiffs' Fourth Cause of Action is for violation of Section 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t. In these Causes of Action, Plaintiffs claim that Laura and Brooks were control persons and therefore secondarily liable for any misrepresentations and/or omissions.

Plaintiffs' Fifth Cause of Action is an common law fraud claim and the Sixth Cause of Action is a common law civil conspiracy claim. Finally, Plaintiffs' Seventh Cause of Action is for violation of the Ohio Securities Act, Ohio Rev. Code § 1707.44(B), (C)(1), (D), (F) and (G).

Now before the Court are Motions for Summary Judgment filed by Laura (doc. #108) and Brooks (doc. #106). Both of these Motions are now fully briefed and ripe for decision. A factual background will first be set forth followed by the standard of review for motions for summary judgment and an analysis of the Motions.

## I. FACTUAL SUMMARY[1]

This matter arises from the purchase of Debenture Notes by the Plaintiffs. The Debenture Notes were issued by VWE Group, Inc. dba V.W. Eimicke Associates, Inc. (hereinafter "VWE").

### A. The Company

VWE was a New York company founded by Victor W. Eimicke ("Victor") in 1958. (TAC ¶ 16.) Initially VWE produced and sold forms and other materials used by companies in

---

[1] When contested, the facts herein are presented, as they must be, in a light most favorable to the Plaintiffs who are the non-moving parties.

the hiring, firing and motivation of employees (the "HR Business"). (Id.) Several years ago

VWE began selling holiday greeting cards (the "Greeting Card Business") in addition to its HR

Business. (Id. ¶ 17.)

Victor served as VWE's President and managed all of its operations until he passed away

on September 4, 2000. (TAC ¶ 14; Deposition of Loretta Buscarino ("Buscarino Dep.") 9-10

May 22, 2007.) Victor and his wife Maxine had two daughters, Alicia and Laura. (Affidavit of

Laura E. Klimley ("Laura Aff.") ¶ 4 Sept. 3, 2007.) At some point during the 1990s, Victor

gifted all of his stock in VWE to Laura and Alicia, giving them each a 50% share of the

company. (Id. ¶ 5.)

By 2003, the Greeting Card Business surpassed the HR Business and accounted for 75%

of VWE's revenues. (TAC ¶ 17.) In December of 2003, VWE sold its Greeting Card Business to

an entity known as the Taylor Group. (Id.)

Following the sale of the Greeting Card Business, VWE filed for relief pursuant to

Chapter 11 of the United States Bankruptcy Code. (TAC ¶ 18.) VWE's bankruptcy petition was

filed on June 1, 2004, and is currently pending in the United States Bankruptcy Court for the

Southern District of New York, case number 04-20308. (Id.) VWE ceased operations as a

company in July of 2006. (Deposition of Elizabeth Longinetti ("Longinetti Dep.") 8 May 22,

2007.) During its operation, VWE had an official policy of not giving out any financial

information to its investors or to anyone else. (Deposition of Brooks J. Klimley ("Brooks Dep.")

97 Mar. 9, 2007.)

-4-

**B.      The Debenture Notes**[2]

From its inception, VWE offered Debenture Notes with terms from 90 days to 5 years, interim maturity periods of between 1 and 3 years and interest rates from 10 to 23%. (TAC ¶ 19.) At first the Debenture Notes were issued to "very close friends and family" of the Eimickes. (Deposition of Barbara DeMuth ("DeMuth Dep.") 55 May 22, 2007.) Over the years, the Debenture Notes program was expanded as VWE began to issue Debenture Notes to individuals and entities "all over the country." (Id.)

There is no evidence that the Debenture Notes issued by VWE were registered with the Securities and Exchange Commission or any state in which they were offered. When VWE filed for bankruptcy, the outstanding principal amount of the Debenture Notes issued by VWE was more than $26 million. (TAC ¶ 20.)

Ed originally invested in VWE Debenture Notes when he received a call at his home in Ohio from Victor in 1988. (Deposition of Wayne E. Pullins ("Ed Dep.") 19-20, 26 Feb. 22 and 23, 2007.) At that time, Victor stated that, as a "favor" to Ed, he would permit Ed to invest in the family business which he had specifically designed to make money for the family. (Id. 20.) Ed acknowledges that he never saw a financial statement prior to purchasing a Debenture Note. (Id. 201.)

Following this initial investment, Ed and his family continued to invest throughout the nineties in response to telephone calls and written solicitations from VWE. (Id. 56-60.) In addition to investing new money, Ed and his family reinvested interest that they received on the

---

[2]A debenture is a debt secured only by the debtor's earning power and not by a lien on specific assets. *Black's Law Dictionary* (8th ed. 2004). A debenture note is an instrument acknowledging such a debt. Id.

Debenture Notes and reinvested principal when a Debenture Note became due. (Affidavit of Wayne E. Pullins ("Ed Aff.") ¶¶ 2-6 Sept. 26, 2007.)

For 15 years from 1989 until just prior to VWE's bankruptcy, the Plaintiffs have presented evidence that they made investments totaling $1,389,982 in VWE's Debenture Notes[3] and were paid or accrued 15% per year interest. (See Ed Dep. 208-13; Ed Aff. ¶¶ 2-6.) Over 100 other individuals or entities also invested in VWE's Debenture Notes. (Brooks Klimley Mem. In Supp. of Mot. Summ. J. 1.) These investors cannot recover their investments from VWE which filed bankruptcy, from Victor who is deceased or from Maxine or Alicia who have either filed for personal bankruptcy or have no assets from which to collect. (Id.)

### C. Laura Klimley

Laura Eimicke married Brooks in 1981 and currently resides in Bronxville, New York. (Deposition of Laura E. Klimley ("Laura Dep.") 6-7 Mar. 8, 2007.) Laura studied dance in college and graduate school and, after marrying Brooks in 1981, took a job teaching dance at a preparatory school. (Laura Aff. ¶ 6.) At some point, Laura was appointed a Vice-President of VWE and a member of VWE's Board of Directors. (Id.)

When she became tired of teaching dance in 1985, Laura went to work for VWE. (Id. ¶ 7.) Her responsibilities at the time included writing copy for the catalogs and brochures, working in the direct mail customer list rental division and dealing with personnel issues at the plant. (Id. ¶ 8.)

Laura was employed full-time at VWE until 1996 when she gave birth to triplets. (Id. ¶

---

[3]VWE admitted in its bankruptcy filing that it owed this amount or something close to this amount to the Pullins.

7.) She then began working part-time. (Id.) After 1999, Laura no longer worked at VWE as an employee of VWE and stayed home with her children. (Id. ¶ 9.)

Laura held the title of Vice-President and was a director of VWE up to the date of the bankruptcy in 2004. (Laura Dep. 38-40.) In addition to 50% of the voting shares in VWE, Laura held 1046.5 of a total of 2093 Common B non-voting shares of VWE, 111 of 189 Preferred A non-voting shares of VWE and 814 of 15978 Preferred B non-voting shares of VWE. (Id. 74-75.) Laura testified that she does not know how much she received in salary for VWE and does not recall receiving a dividend. (Id. 121-22.)

### D.     Brooks Klimley

Brooks Klimley met Laura Eimicke in 1977 during his sophomore year at Columbia University. (Affidavit of Brooks Klimley ("Brooks Aff.") ¶ 3 Sept. 3, 2007.) At the time, Laura was a freshman at Barnard College studying dance. (Id.)

Brooks graduated magna cum laude from Columbia University in New York with a degree in economics. (Brooks Dep. 18-19.) He then went on to obtain a degree in jurisprudence from Oxford University in Oxford, England. (Id. 19.)

After marrying Laura in 1981, Brooks worked full time as an investment banker for Chemical Bank (1981-1984), Kidder Peabody (1984-1994), Bear Stearns (1998-2001) and Citigroup (2001-2004) and, at the time of his deposition, was the President of CIT Energy. (Brooks Aff ¶ 4; Brooks Dep. 22.) Brooks holds series 7, series 24 and series 63 certifications from the National Association of Security Dealers. (Answers To Requests for Admissions of B. Klimley.) In a recent deposition in another lawsuit against Brooks, he testified that, at Bear Stearns, he was known as "Dr. Value" for his creativity in complex investment banking

transactions. (Deposition of Brooks Klimley ("Brooks Dec. Dep.") 241-42 Dec. 7, 2007.) There is no evidence that Brooks was ever an officer, director, shareholder or employee of VWE.

Beginning in the 1990s, Brooks purchased VWE Debenture Notes for himself and his children and continued to do so until 2004. (Brooks Aff. ¶ 7.) Brooks claims that he did not ask to see any financial records in connection with VWE when he purchased the Debenture Notes and relied upon the representations of Victor that he would be repaid. (Brooks Dep. 60-61.) When VWE declared bankruptcy, the company owed Brooks, Laura, their children and The Klimley Foundation $2,085,003.05. (Brooks Aff. ¶ 7.)

### E.     Alicia Eimicke

Alicia consistently played an active role in VWE's business activities. She joined VWE after graduating from Harvard University.  (Laura Aff. ¶ 10.) Alicia worked with Victor to manage VWE's day-to-day operation. (Longinetti Dep. 17; DeMuth Dep. 13-15.) After Victor's death in 2000, Alicia became President of VWE and managed the day-to-day operation of the business. (Longinetti Dep. 13-15.)

### F.     Plaintiffs' Familial Relationships

Ed is a resident of the State of Ohio. (TAC ¶ 6.) Dianne is Ed's wife and David is Ed's son. (Ed Dep. 6.) Victor was Ed's uncle. (Id. 26.)

Plaintiff Robert Howard is also Ed's uncle. (Id. 7.) Ed has testified that Robert Howard is no longer interested in proceeding in this litigation (id.) but Robert Howard remains a named Plaintiff. Finally, Ed's mother, now deceased, was Maxine's sister. (Ed Dep. 26.)

## II.     SPOLIATION OF EVIDENCE

Brooks and Laura argue that Plaintiffs claims should be dismissed because they have

intentionally "spoiled" evidence. Specifically, according to the Defendants, Ed admits that he destroyed a tape recording of a meeting, destroyed notes that he took regarding telephone conversations with potential witnesses and destroyed executed affidavits and statements that would either corroborate or undermine the potential testimony of these witnesses.

In addition, the Plaintiffs argue that VWE engaged in the spoilation of evidence and the Court should infer that each document that was destroyed contained concrete evidence that Brooks and Laura were heavily involved in the operations of VWE and the sale of Debenture Notes. Brooks and Laura respond that there is no evidence that they were involved in the shredding or that the shredding was improper.

### A.    Relevant Law Regarding Spoilation of Evidence

"Spoilation is the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for the destruction." *In re Smartalk Teleservices, Inc. Securities Litigation*, 487 F. Supp. 2d 947, 949 (S.D. Ohio 2007)(quoting *Beck v. Haik*, 377 F.3d 624, 641 (6th Cir. 2004). Further, "the rules that apply to an alleged spoilation of evidence and the appropriate sanctions are defined by state law." *Id.*

In this case, this Court sits in Ohio, the Defendants provide legal argument based upon Ohio law and the Plaintiffs do not argue otherwise. Therefore, Ohio spoilation law will be used.

Ohio recognizes the spoilation of evidence as an independent cause of action. *Id.* However, spoilation may also be raised as an affirmative defense, in a motion for summary judgment, in a motion to dismiss or in a Rule 37 motion for sanctions. *Loukinas v. Roto-Rooter Services Co.*, 855 N.E.2d 1272, 1278 (Ohio Ct. App. 2006). If not pursued as a independent cause of action, which is the case here, the elements of a spoilation claim are nonetheless

instructive in considering whether the imposition of sanctions is proper. *In re Smartalk*, 487 F. Supp. 2d at 949.

The elements of a spoilation claim, as they would be applied to this case, are: (1) there is a pending or probable litigation involving the non-offending party; (2) knowledge on the part of the offending party that the litigation exists or is probable; (3) wilful destruction of the evidence by the offending party designed to disrupt the non-offending party's case; (4) disruption of the non-offending party's case; and (5) damages proximately caused by the offending party's actions. *In re Smartalk*, 487 F. Supp. 2d at 949; *see also Herlik v. Continental Airlines, Inc.*, No. 04-3790, 2005 WL 2445947 at *6 (6th Cir. Oct. 4, 2005). Finally, even if the evidence was not deliberately destroyed, negligent or inadvertent destruction of evidence is sufficient to trigger sanctions. *In re Smartalk*, 487 F. Supp. 2d 950.

If relevant evidence was indeed destroyed, a court has the power to fashion a just remedy. *Id.* In fashioning a just remedy, the court must balance the intent of the offending party, the level of prejudice, and the reasonableness of the offending party's action. *Id.* "The test for prejudice is where there is a reasonable possibility, based on concrete evidence, that access to the evidence which was destroyed or altered, and which was not otherwise obtainable, would produce evidence favorable to the objecting [non-offending] party." *Loukinas*, 855 N.E.2d at 1278.

The least severe sanction should be imposed - a sanction that is proportionate to the seriousness of the infraction under the facts of the particular case. *In re Smartalk*, 487 F. Supp. 2d 950. Said another way, the sanction imposed must be commensurate with the degree of prejudice. *Loukinas*, 855 N.E.2d at 1278.

**B.      Spoilation By Ed**

In this case, Ed testifies that he invited creditors to attend two meetings in December of 2005. (Ed Dep. 220.) Only one of the meetings was held. (Id. 223.) He tape recorded the meeting and threw the tape away afterwards because "there wasn't any information on it" and it was useless to him. (Id. 224-25.) Further, when Ed sent out the invitation to the meetings, he invited those who could not attend to send a letter relating their experiences with VWE. (Id. 229.) The written statements that he received were read at the meeting and later thrown away by Ed because they were repetitive of what was being said at the meeting. (Id. 229-30.)

Ed also testifies that he contacted potential witnesses by telephone. (Id. 243.) He would ask the potential witness if it was okay to prepare an affidavit for them to sign. (Id.) If so, Ed would prepare and forward an affidavit for signature. (Id. 244.) Ed remembers sending "two or three" affidavits for signature. (Id. 243.) Ed took notes of the telephone conversations and testifies that he later threw the notes away. (Id.244.) He also destroyed draft affidavits that were not sent to potential witnesses. (Id. 246.)

The Plaintiffs first argue that Ed did not destroy his personal notes. (Pullins Sur-Reply to Mots. for Summ. J 15.) According to the Plaintiffs, Ed kept his notes on VWE's Schedule F to VWE's bankruptcy filing and these notes have been provided to the Defendants. (Id.)

Plaintiffs also argue that, while Ed did not keep the tape of the December 2005 meeting, he did provide Defendants with a list of those in attendance. (Id.) And, since the list was provided, the Defendants have deposed some of the individuals in attendance. (Id.) Further, the Defendants have a copy of one of the unsigned affidavits sent out by Ed and have taken the deposition of the individual who received and refused to sign this affidavit. (Deposition of

-11-

Michelle Bronski ("Bronski Dep.") Ex. 1 May 2, 2007.)

Based upon the information presented to the Court, some, but not all of the elements of a spoilation claim exist in this case. Ed knew that there was pending or probable litigation against the Defendants. He also testified that he destroyed personal notes, a tape recording and draft affidavits that were not forwarded for signature. However, the Defendants cannot be said to have been harmed. They allegedly have copies of Ed's notes, they have a list of attendees at the meeting and presumably have deposed at least some of those individuals and they have deposed at least one individual who received and refused to sign an affidavit drafted by Ed. Further, there is not a reasonable probability, based on concrete evidence, that access to the evidence which was destroyed or altered, and which was not otherwise obtainable, would produce evidence favorable to Brooks and Laura, particularly since Brooks and Laura have access to most, if not all of the evidence destroyed by Ed. Therefore, since the Defendants cannot be said to have been prejudiced, sanctions are not appropriate.

C.      **Spoilation By Brooks and Laura**

Laura Pignone was VWE's Telemarketing Manager from 1997 until she voluntarily left in 2004. (Deposition of Laura Pignone ("Pignone Dep.") 8 June 26, 2007.) She reported directly to Alicia and was located in VWE's main office on Grassy Spring Road. (Id. 10-11.)

Between the filing of VWE's Bankruptcy in June of 2004 and September of 2004, Laura Pignone observed a "tremendous amount of shredding being done" off site by a contractor. (Id. 53-55.) VWE had always shredded unneeded documents but the shredding took place in house prior to the Bankruptcy filing. (Id.) Also, the volume of documents being shredded increased after the Bankruptcy filing. (Id.) Laura Pignone, however, does not know what was being

-12-

shredded. (Id.)

Laura Pignone's observations, alone, are not enough to satisfy a spoilation claim. She does not know what documents were being shredded, who was responsible for shredding them or why. The analysis next turns to the standard of review for motions for summary judgment.

## III.     STANDARD OF REVIEW

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate

the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the non-moving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

However, the mere existence of a scintilla of evidence in support of the non-moving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the non-moving party is entitled to a verdict. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not …obligated to wade through and search the entire record for some specific facts that might

-14-

support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

The Plaintiffs' causes of action in this case include claims brought pursuant to Ohio law and issues interpreted under Ohio law. In reviewing an Ohio claim or an issue under Ohio law, this Court must apply the law of Ohio, as interpreted by the Supreme Court of Ohio. *Northland Ins. Co. v. Guardsman Prods. Inc.*, 141 F.3d 612, 617 (6th Cir. 1998). Specifically, this Court must apply the substantive law of Ohio "'in accordance with the then-controlling decision of the highest court of the state.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001)(quoting *Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 808 (6th Cir. 1998)). Also, to the extent that the highest court in Ohio has not addressed the issue presented, this Court must anticipate how Ohio's highest court would rule. *Id.* (quoting *Bailey Farms. Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994)).

In this case, Brooks and Laura seek summary judgment on each of Plaintiffs' claims and seek a ruling that the Plaintiffs are not entitled to punitive damages. Brooks' and Laura's arguments regarding each of Plaintiffs' claims will be addressed followed by an analysis of the availability of punitive damages.

## IV.     FIRST CAUSE OF ACTION: SECTION 12(a)(1) AND 12(a)(2) CLAIMS

Plaintiffs first assert that Brooks and Laura sold unregistered securities. Plaintiffs also

-15-

assert that Brooks and Laura sold those securities through a prospectus or oral communication that contained misrepresentations or omissions.

Under Section 12(a)(1) of the Securities Act of 1933, the seller of a security is liable to a purchaser if the sale violates the registration provisions of the Securities Act of 1933 unless exempted. *Cook v. Avien, Inc.*, 573 F.2d 685, 691 (1st Cir. 1978). Further, if securities are sold without full disclosure or effective access to significant information, there is no exemption to the registration requirement. *Id.*

Liability attaches under Section 12(a)(2) if: (1) the defendant made a false or misleading statement of material fact or failed to state a material fact necessary in order to make the statement not misleading; (2) the plaintiff did not know of the untruth or omission; and (3) the defendant knew, or in the exercise of reasonable diligence, could have known of the untruth or omission. *Id.* (citing *Alton Box Board Co. v. Goldman, Sachs & Co.*, 560 F.2d 916 (8th Cir. 1977).

Brooks and Laura argue that these claims are time-barred, that neither of them solicited or sold securities and that the statements they allegedly made are not material. The Plaintiffs respond that their claims are not time-barred, that both Brooks and Laura are "sellers" for purposes of the Section 12(a)(1) and 12(a)(2) claims and that the statements made were material.

A.    **Timeliness of Section 12(a)(1) and 12(a)(2) Claims**

The law regarding the timeliness of Plaintiffs' Section 12(a)(1) and 12(a)(2) claims will first be set forth. This is followed by a determination of the relevant dates and an analysis of the timeliness of Plaintiffs' Section 12(a)(1) and 12(a)(2) Claims.

1.    **Applicable Statues of Limitation and Repose**

-16-

Section 13 of the Securities Act of 1933 provides that no action shall be maintained under Section 12(a)(1) "unless brought within one year after the violation upon which it is based." 15 U.S.C. § 77m. It further provides that no action shall be maintained under Section 12(a)(2) "unless brought within one year after discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." Id.

Section 13 also provides a period of repose. A Section 12(a)(1) claim cannot be brought "more than three years after the security was bona fide offered to the public." Id. A Section 12(a)(2) claim cannot be brought "more than three years after the sale." Id.

The Plaintiffs have the burden of pleading facts that show compliance with Section 13's limitation periods. *In re National Mortgage Equity Corp. Mortgage Pool Certificates Securities Litigation*, 636 F. Supp. 1138, 1166 (C.D. Cal. 1986)(citing *Toombs v. Leone*, 777 F.2d 465, 468 (9th Cir. 1985)). The Plaintiffs must demonstrate compliance with both the statute of limitations and the statute of repose. *Id.* (citing *Morley v. Cohen*, 610 F. Supp. 798, 815 (D. Md. 1985)).

The Plaintiffs urge the Court to apply a different statute of limitations and statute of repose to their Section 12(b)(1) and 12(b)(2) claims. They urge the Court to apply the statute of limitations and statue of repose found in the Sarbanes-Oxley Act (the "SOA").

Enacted on July 30, 2002, the SOA provides a two-year statute of limitations and a five year statute of repose to "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws…" *Lieberman v. Cambridge Partners, L.L.C.*, 432 F.3d 482, 486 (3d Cir. 2005) (citing SOA, Pub. L. No. 107-204 § 804, 116 Stat. 745, 801, codified in part at 28 U.S.C. § 1658(b)). However, while the caselaw is limited, those courts that have considered the issue

have determined that the SOA time limitations do not apply to claims that are based upon negligence or strict liability and do not require a showing of fraudulent intent. *See In re Enron Corporation Securities, Derivative and "ERISA" Litigation*, No. H-01-3624, 2004 U.S. Dist. Lexis 8158 at * 51 (S.D. Tex. Feb. 25, 2004)(SOA time limitations do not apply to Section 12(a)(2) claims); *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 289 F. Supp.2d 416, 423 (S.D.N.Y. 2003)(15 U.S.C. § 77m applies to Section 12(a)(2) claims and the SOA applies to 10-b5 claims); *Friedman v. Rayovac Corp.*, 295 F. Supp.2d 957, 974-75 (W.D. Wis. 2003)(SOA does not apply to claims brought under the Securities Act of 1933).

While Plaintiffs may have alleged fraud in connection with their Section 12(a)(1) and 12(a)(2) claims, these two alleged violations of the Securities Act of 1933 do not require a showing of fraud. Therefore, the one-year statute of limitations and three-year statute of repose found in 15 U.S.C. § 77m will be applied to Plaintiffs' Section 12(a)(1) and 12(a)(2) claims.

## 2. Relevant Dates

To apply the one-year statute of limitations to the Section 12(a)(1) claims, the date the claim was filed and date of the violation must be determined. To apply the one-year statute of limitations to the Section 12(a)(2) claims, the date the claim was filed and the date when the untrue statement was discovered or should have been discovered by the exercise of reasonable diligence must be determined.

To apply the three-year statute of repose to the Section 12(a)(1) claims, the date the claim was filed and the date the security was first bona fide offered to the public must be determined. To apply the three-year statute of repose to the Section 12(a)(2) claims, the date the action was filed and the date the security was sold must be determined.

### a.     Date When the Claim Was Filed

 Plaintiffs' original Complaint was filed in the Court of Common Pleas for Clark County, Ohio on January 26, 2005, and was subsequently removed to this Court. The original Complaint included causes of action for engaging in a pattern of corrupt activity under Ohio law, fraud, civil conspiracy, and violation of Ohio's Blue Sky laws.

On July 22, 2005, the Plaintiffs filed an Amended Complaint which added claims of violation of Sections 12(a)(1) and 12(a)(2) of the Securities Act of 1933 and violation of Rule 10b of the Security Exchange Act of 1934. The Amended Complaint also brought the action of engaging in a pattern of corrupt activity under federal law instead of state law.

On November 2, 2005, the Plaintiffs again amended their Complaint. The Second Amended Complaint includes the same Parties and causes of action as the First Amended Complaint and indicates that it was filed pursuant to the instructions of the United States Bankruptcy Court for the Southern District of New York.

Following and pursuant to this Court's ruling on Defendants' Motion To Dismiss the Second Amended Complaint, the TAC was filed on April 6, 2006. The TAC adds Brooks Klimley as a Defendant and includes the particulars of the allegations of fraud.

The Defendants argue that the Plaintiffs did not file any claim against Laura until January 26, 2005 and did not file the Section 12(a)(1) and 12(a)(2) claims, or any federal securities claims, against Laura until July 22, 2005. They also argue that the first claim against Brooks was filed on January 18, 2006. The Plaintiffs respond that their first claim was filed on January 26, 2005, and that the subsequent claims against both Laura and Brooks relate back to that claim.

The Defendants do not dispute that the claims against Laura relate back to the filing of the original complaint on January 26, 2005, but argue that the TAC against Brooks does not relate back.[4]

### i.     Relevant "Relate Back" Law

The Plaintiffs ground their argument that the claim set forth in the TAC relates back to the filing of the original complaint on Fed. R. Civ. P. 15(c)(3). However, Fed. R. Civ. P. 15(c)(3) no longer exists. Fed. R. Civ. P. 15 was amended effective December 1, 2007, as part of the "general restyling of the civil rules to make them more easily understood" and these 2007 "changes are intended to be stylistic only." (2007 Amendment Note to Fed. R. Civ. P. 15.) Since the 2007 changes are intended to be stylistic only and the caselaw refers to and interprets the prior Rule 15(c)(3), the prior Rule 15(c)(3) will be used herein.

When a complaint is amended to add a defendant, Rule 15(c)(3) controls whether the amended complaint may relate back to the filing of the original complaint for purposes of the running of a statute of limitations. *Pompey v. Lumpkin*, 321 F. Supp.2d 1254, 1258 (M.D. Ala. 2004)(citing *Powers v. Graf*, 148 F.3d 1223, 1225 (11th Cir. 1998)), *aff'd* 127 F. App'x 473 (11th Cir. 2005). Further, Rule 15(c) is liberally construed by federal courts. *Snoqualmie Tribe of Indians v. United States*, 372 F.2d 951 n.5 (Cl. Ct. 1967). It assures that the rights of the parties to a transaction or occurrence can be determined on the merits rather than on procedural difficulties. *Id.*

---

[4] Brooks Klimley was first named as a defendant in the TAC which was filed on April 6, 2006.

Pursuant to Rule 15(c)(3), an amendment that adds a party relates back when (1) the claim or defense asserted in the amended complaint arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading; (2) when the party being added has received notice of the complaint within the period provided by Rule 4(m) for service of the summons and complaint; and (3) when the party being added knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party. *Pompey*, 321 F. Supp.2d at 1258 (citing Rule 15(c)(3)). A mistake occurs where the wrong party is blamed while the real culprit remains unknown and also where the plaintiff has full knowledge of all relevant actors but lists the technically incorrect parties. *Kinnally v. Bell of Pennsylvania*, 748 F. Supp. 1136, 1142 (E.D. Pa. 1990).

Courts impute the notice of a lawsuit, termed "constructive notice," when there is sufficient "identity of interests" between the original and new parties. *Id.* at 1263 (citing *Jacobsen v. Osborne*, 133 F.3d 315, 320 (5th Cir. 1998). Constructive notice can exist when the original and added parties are a parent corporation and its wholly owned subsidiary, when the original party and the added party are co-executors of an estate and when the original party and new party share counsel. *Id.* Further, constructive notice may exist when the original and added parties are so closely related in business or other activities that it is fair to presume the added parties learned of the institution of the action shortly after it was commenced. *Wine v. EMSA Limited Partnership*, 167 F.R.D. 34, 38 (E.D. Pa. 1996)(citing *Advanced Power Systems, Inc. v. Hi-Tech Systems, Inc.*, 801 F. Supp. 1450, 1456 (E.D. Pa. 1992)); *In re Integrated Resources Real Estate Limited Partnerships Securities Litigation*, 815 F. Supp. 620, 647 (S.D.N.Y. 1993)(a growing number of courts and commentators have concluded that sufficient notice exists when a

party who has some reason to expect his potential involvement as a defendant hears of the commencement of litigation through some informal means). Finally, the plaintiff has the burden of showing that the added party received constructive notice. *Id.*

### ii.     "Relate Back" Analysis

In this case, the claims asserted in the TAC arose out of the conduct, transactions and occurrences set forth in the original complaint. Further, Brooks received constructive notice of the original complaint when it was filed against Laura and should have expected that, while his involvement may have been unknown by others at the time, he might ultimately be included as a Defendant.

Brooks had constructive knowledge of the original complaint because it was brought against his spouse with whom he presumably had an informal relationship. Also, based upon Plaintiffs' factual allegations, Brooks had reason to believe that he would be named as a party because he was involved in VWE. (Deposition of Dianne Pullins ("Dianne Dep.") 16-17, 77, 107-08 Mar. 22, 2007); Deposition of David Pullins ("David Dep.) 82-83, 102-04 Mar. 23, 2007); Affidavit of Thomas Romo ("Romo Aff.") ¶¶ 1-3 Feb. 26, 2007.) Finally, both Brooks and Laura have been jointly represented by Mr. Kindseth's office in connection with matters concerning VWE.[5]

Therefore, for purposes of the Section 12(a)(1) and 12(a)(2) claims against both Brooks and Laura, January 26, 2005, the date the Plaintiffs original complaint was filed, is the date the

---

[5]The record in VWE's bankruptcy case indicates that Mr. Kindseth and his partners have represented Brooks and Laura in connection with the VWE bankruptcy and the various claims asserted against them by the Creditors Committee since at least December of 2004.

claims were filed for purposes of statute-of-limitation analysis. Laura was a named Defendant in the original Complaint and the Amended Complaint arose out of the same conduct, transactions and occurrences set forth in the original Complaint. Brooks had constructive notice of the original Complaint and the claims set forth in the TAC, which first named Brooks as a Defendant, arose out of the conduct, transactions and occurrences set forth in the original Complaint. The analysis next turns to the date of the alleged Section 12(a)(1) violations.

      **b.**      **Date of the Alleged Section 12(a)(1) Violations**

Section 13 provides that a 12(a)(1) claim must be brought within one year after the sale upon which it is based. 17 U.S.C. § 77m. In this case, Brooks and Laura argue and the Plaintiffs agree that the Plaintiffs last purchased debenture notes from VWE on January 1, 2004.

      **c.**      **Date When the Alleged Section 12(a)(2) Untrue Statement Was Or Should Have Been Discovered**

Brooks and Laura argue that the Plaintiffs were on inquiry notice about the alleged true state of affairs by at least June 2, 2004, when VWE filed for Bankruptcy. The Plaintiffs agree that they were on inquiry notice when the Bankruptcy was filed on June 2, 2004.

      **d.**      **Date When the Security Was First Bona Fide Offered To the Public for Purposes of the Section 12(a)(1) Claims**

Brooks and Laura argue that the Plaintiffs, as they allege, were first offered Debenture Notes in 1989. The Plaintiffs respond that Ed purchased securities from VWE's I-1, I-4, I-7, I-13 and I-15 offerings, that Dianne purchased securities from VWE's I-7, I-9 and I-13 offerings and that David purchased securities from VWE's I-9, I-12, I-13 and I-15 offerings and that, based upon VWE's records, each offer is separate and distinct and each was made available at a

different time.

The Plaintiffs further argue that Brooks and Laura have failed to identify the date that each of these offerings was first offered to the public and cannot prove their statute of limitations defense without this information. Brooks and Laura reply by identifying evidence that offering I-1 was first sold to Plaintiffs on January 1, 1989, I-4 on September 22, 1992, I-7 on November 12, 1998, I-9 on February 17, 1998, I-12 on December 12, 2000, I-13 on October 1, 2001, and I-15 on October 1, 2003. (Laura Mem. Ex. G.)

A stock, even if unregistered, is bone fide offered when it is genuinely offered to the public. *P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92 (2d Cir. 2004)(citing *Kubic v. Goldfield*, 479 F.2d 472, 475 (3d Cir. 1973)). Further, the majority of courts have found that the three-year period begins when the security is first bona fide offered and not when last bona fide offered. *Id.* at 100; *but see In re National Mortgage*, 636 F. Supp. at 1166 (the statute begins to run from that date of defendant's last sales-related activity, i.e., offer, sale or delivery of the security).

In this case, there were several offerings of debenture notes. Each offering was made at a different time, the offerings had different term periods, the offerings had different interim maturity periods, the offerings had different interest rates, and each offering became due at a different date. Therefore, each of the offerings will be considered to be a bona fide offering and the dates that each offering was sold will be when each of the Debenture Notes was first bona fide offered.

        **e.**      **Date the Security Was Sold for Purposes of the Section 12(a)(2) Claims**

-24-

Courts generally consider the date of sale relating to Section 12(a)(2) claims as the last of three occurrences: the date the security was first offered for sale, the date it was sold or the date it was delivered. *In re Enron*, 2004 U.S. Dist. LEXIS 8158 at *77. In this case, since each of the offerings will be considered as a sale of a security, the date each of the offerings was sold will be the date of sale.

### 3.    Timeliness Analysis

The statute of limitations that applies to Plaintiffs' 12(a)(1) claims requires that Plaintiffs' Complaint be brought within one year after the violation upon which it is based and not later than three years after the security was bona fide offered to the public. 15 U.S.C. § 77m. In this case, Plaintiffs' 12(a)(1) claims were brought on January 26, 2005 and the most recent alleged violation occurred on January 1, 2004 when the I-19 offering was purchased.

The Plaintiffs suggest that their Section 12(a)(1) claim is timely because of equitable tolling. Some courts have found that equitable tolling does not apply to Section 12(a)(1) claims. *In re Colonial Ltd. Partnership Litigation*, 854 F. Supp. 64, 86 (D. Conn. 1994). Those courts that have considered equitable tolling have either considered it with regard to the service requirement found in Rule 4(m), *Pompey*, 321 F. Supp.2d at 1265, or with regard to cases where there was concealment of the fact that the securities were not registered. *Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1055 (2d Cir. 1969); *In re Colonial*, 854 F. Supp. at 86; *Jones v. Lewis*, No. 86-1547-T, 1988 WL 163026 at *2 (D. Kan. June 13, 1988); *In re Gas Reclamation, Inc. Securities Litigation*, 659 F. Supp. 493, 507 (S.D.N.Y. 1987); *In re National Mortgage*, 636 F. Supp. at 1166-67.

In this case, the Plaintiffs make no allegations regarding service of their Complaint or no

-25-

allegations that Brooks and Laura made fraudulent misrepresentations about the registration of the Debenture Notes. Therefore, the doctrine of equitable estoppel does not apply to Plaintiffs' 12(a)(1) claims.

The one-year requirement is not satisfied by any of Plaintiffs' 12(a)(1) claims. Since both the one-year and three-year requirements must be satisfied, Plaintiffs' 12(a)(1) claims against both Laura and Brooks are barred and must be dismissed.

The statute of limitations that applies to Plaintiffs' 12(a)(2) claims requires that Plaintiffs' Complaint be brought within one year after the discovery of the untrue statement or omission and not later than three years after the sale. In this case, Plaintiffs' 12(a)(2) claims were brought on January 26, 2005, and the untrue statements or omissions were discovered on June 2, 2004. Therefore, Plaintiffs' 12(a)(2) claims are not barred by the one-year limit.

One of Plaintiffs' 12(a)(2) claims is also not barred by the three-year limit. Plaintiffs' 12(a)(2) claims were brought on January 26, 2005, and the sale of the I-15 offering occurred on October 1, 2003. The sale of the other offerings about which Plaintiffs complain occurred outside of the three year limit and causes of action regarding these sales are barred by the three-year limit.

Plaintiffs' 12(a)(2) claim regarding the purchase of the I-15 offering is not time barred. Further, the doctrine of equitable estoppel does not apply to the other offerings. *In re Enron*, 2004 U.S. Dist. LEXIS 8158 at *77 (courts have almost uniformly agreed that the three-year time limit is absolute and thus equitable tolling principles are not applied to further extend the three years). In this case, the Plaintiffs do not argue otherwise regarding equitable tolling.

**B.    Sale of Securities**

The elements of a Section 12(a)(2) claim[6] are: (1) the defendants offered and sold a security; (2) by the use of any means of communication in interstate commerce; (3) through a prospectus or oral communication; (4) by making a false or misleading statement of material fact or by omitting to state a material fact; (5) plaintiff did not know of the untruth or omission; and (6) defendants knew, or in the exercise of reasonable care, should have known of the untruth or omission. *Wright v. National Warranty Company,* L.P., 953 F.2d 256, n.3 (6th Cir. 1992); *Wuliger v. Mann*, No. 3:03 CV 1531, 2005 WL 1566751 at *5 (N.D. Ohio July 1, 2005).

Therefore, to make a Section 12(a)(2) claim, the Plaintiffs must show that Brooks and Laura offered and sold them the debenture notes that are not barred by the statute of limitations through an oral communication.[7] Where the defendant is not a direct seller, direct and active participation in the solicitation of the sale must be shown. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1307 (10th cir. 1998). Liability extends "to the person [non owner] who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."[8] *Shaw v. Digital Equipment* Corp., 82 F.3d 1194, 1214-15 (1st Cir. 1996); *Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1132 (W.D. Mich. 1996)(quoting *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)).

---

[6]Since Plaintiffs' Section 12(a)(1) claims are time-barred, only the remaining Section 12(a)(2) claim will be considered.

[7]There is no evidence that a prospectus was involved in the sale of the Debenture Notes.

[8]The definition of seller set forth in *Pinter* was in the context of a Section 12(a)(1) claim but it is well established that this same definition applies to a Section 12(a)(2) claim. *Shaw*, 82 F.3d at 1214; *Picard*, 940 F. Supp. at 1132.

To establish liability as a seller, a plaintiff must demonstrate direct and active participation in the solicitation of the immediate sale. *Picard*, 940 F. Supp. at 1132-33; *see also Shaw*, 82 F.3d at 1215. In other words, a statutory seller must engage in activity which could be considered an offer.[9] *Id.* (citing *PPM America, Inc. v. Marriott Corp.*, 853 F. Supp. 860, 873 (D. Md. 1994)). A non-owner seller must urge a prospective purchaser to buy. *Smith v. American National Bank and Trust Co.*, 982 F.2d 936, 941 (6th Cir. 1992). However, participation in activities relating to the sale of securities, standing alone, does not demonstrate statutory seller status nor does the fact that statements by a defendant were a substantial factor in the purchase demonstrate seller status. *Shaw*, 82 F.3d at 1216.

### 1. Sales By Brooks for Purposes of Section 12(a)(2) Claims

Turning then to this case, Brooks testifies that he has "never solicited or sold any investments in VWE to Plaintiffs or to anyone else. (Brooks Aff. ¶ 11.) Also, Laura testified that she "did not authorize or participate in, and have no knowledge of my father's, mother's and sister's solicitations of Plaintiffs' investments in VWE." (Laura Aff. ¶ 12.) Brooks and Laura also point to Ed's testimony that Victor, Maxine and Alicia solicited him and David to purchase the debenture notes. (Ed. Dep. 15, 39, 59.) This was confirmed by Dianne. (Dianne Dep. 21, 58, 90.)

The Plaintiffs respond by arguing that Brooks made numerous false statements in connection with the financial status of VWE. For example, Brooks allegedly said that the

---

[9]An offer is "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." *Picard*, 940 F. Supp. at 1132-33 (quoting 15 U.S.C. § 77b(3)).

company had plenty of assets to cover the notes outstanding. (Ed Dep. 118.) In another example, Brooks was part of a group sitting around a table who agreed that VWE was doing very well and everyone should do all they can to relieve the anxiety of the shareholders. (Id. 122-25.) At another time, Brooks indicated that Alicia was doing a great job at VWE and "launched" into a dialogue about VWE's financials. (Id. 160, 169-70.)

Dianne testified that Brooks was indirectly involved in the solicitations by Victor because Victor always said that, if anything happened to him [Victor] that Brooks was going to take over and that "Brooks had his eye on everything." (Dianne Dep. 16-17.) She further testified that, on many social occasions, she was told by Brooks and Victor "what a great company it is and we should invest." (Id.) Finally, David testified that, on one occasion, Brooks "had no problem rattling off numbers, saying "I've seen the numbers. They're good. They're strong and profitable. Don't worry." (David Dep. 102-03.)

The Plaintiffs also direct attention to a conflict in Brooks' testimony between what he testified in this lawsuit and what he testified at a recent deposition taken in another lawsuit brought against him. Here, he said he never solicited or sold VWE Debenture Notes to anyone. In the other lawsuit, he testified that Alicia asked him to talk to other potential investors and he specifically remembers talking to at least one. (Brooks Dec. Dep. 166-68) He said, however, that he does not remember talking to Ed. (Id.)

While Brooks may have made statements regarding the financial status of VWE, none of the statements identified demonstrate direct and active participation in the solicitation of the immediate sale of any Debenture Note to the Plaintiffs. Therefore, Brooks was not a "seller" of the Debenture Notes to the Plaintiffs.

-29-

### 2. Sales By Laura for Purposes of Section 12(a)(2) Claim

The Plaintiffs do not identify any specific statements that Laura made regarding sale of the Debenture Notes, and, instead argue that she is liable as a senior officer of VWE, as a director of VWE and as one who held 50% of the voting shares of VWE. In support of this argument, the Plaintiffs cite *Maywalt v. Parker & Parsley Petroleum Co.*, 808 F. Supp. 1037, 1053 (S.D.N.Y. 1992). In *Maywalt*, a group of managers who published a proxy solicitation for a merger and ended up as directors of the resulting company and a group of officers and directors of one of the entities being merged that provided a written recommendation of approval of the merger were found to be sellers for Section 12(a)(2) purposes. 808 F. Supp. at 1053.

However, the situation in *Maywalt* is considerably different from the situation here. In *Maywalt*, there were written publications and here there are no written publications. Here, the only misstatement allegations regarding the sale of Debenture Notes are oral representations by Maxine and Alicia.[10] Since there can be no inference that oral statements of one officer represent the "collective action" of others, Laura can hardly be held liable for the oral statements made by the others. *See In re Smartalk Teleservices, Inc. Securities Litigation*, 124 F. Supp.2d 527, (S.D. Ohio 2000)(there can be no inference that an oral statement of one officer represents the "collective action" of others).

The Plaintiffs have not presented evidence that Laura directly and actively participated in the solicitation of the immediate sale of any debenture notes. Therefore, Laura was not a "seller" of the Debenture Notes.

---

[10]Victor was deceased at the time of the sale of the Debenture Notes actionable under Section 12(a)(2) and there is no evidence of written communications after that time.

**C.     Conclusion On Section 12(a)(1) and Section 12(a)(2) Claims**

There are no genuine issues of material fact and both Brooks and Laura are entitled to judgment as a matter of law on Plaintiffs' Section 12(a)(1) and Section 12(a)(2) claims against them. Action on all of Plaintiffs' Section 12(a)(1) claims is time-barred. Action on all but one of Plaintiffs' Section 12(a)(2) claims is time-barred. Finally, the Plaintiffs have presented no evidence that either Brooks or Laura sold or solicited the sale of the Debenture Note to them upon which action is not time-barred.

Since summary judgment has been granted based upon the statute of limitations and the requirement that the defendant be a seller of the actionable security to the purchaser, the materiality of the alleged statements need not be addressed for purposes of the Section 12(a)(1) and 12(a)(2) claims. The analysis next turns to Plaintiffs' Second Cause of Action.

**V.     SECOND CAUSE OF ACTION: 10b-5 CLAIMS**

Plaintiffs' Second Cause of Action asserts that Brooks and Laura violated Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5 which prohibit making material misstatements in connection with the purchase or sale of securities. To be actionable, the conduct giving rise to the 10b-5 claim must be more than negligent. *Cook*, 573 F.2d at 692.

Section 10(b) of the Securities Exchange Act of 1934 was designed as a "catchall clause to prevent fraudulent practices." *Picard*, 940 F. Supp. at 1119 (quoting *Chiarella v. United States*, 445 U.S. 222, 226 (1980)). Section 10(b) makes it unlawful to employ, in connection with the purchase or sale of securities, any "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe…" *Id.* (quoting *Chiarella*, 455 U.S. at 226). Rule 10b-5 promulgated by the Securities

and Exchange Commission makes it unlawful in connection with the purchase or sale of any security "(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." *Id.* (quoting 17 C.F.R. 240,10b-5). Section 10(b) and Rule 10b-5 reach beyond statements and omissions that are made in registration statements and that are actionable under Sections 12(a)(1) and 12(a)(2) to create liability for false or misleading statements or omissions of material fact in connection with trading in the secondary market. *Shaw*, 82 F.3d at 1216-17.

The elements of a 10b-5 claim are: (1) scienter on the part of the defendant; (2) materiality of the alleged misrepresentations or omissions by the defendant; (3) actual reliance by plaintiff upon the defendant's misstatements or omissions; and (4) justifiable reliance. *Wright*, 953 F.2d at n.1 (citing *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, n.16 (11th Cir. 1984)).

The alleged violator need not directly communicate with the plaintiff for primary liability for a 10b-5 claim to attach. *Picard*, 940 F. Supp. at 1120. A third-party defendant may be liable as a primary violator where the third-party defendant controlled the content of the misleading statement.[11] *Id.*

Brooks and Laura argue that Plaintiffs' 10b-5 claims are time-barred, that the statements

---

[11]The control over a specific third-party statement needed to establish primary 10b-5 liability is not the equivalent of the degree of control over an actor needed to establish a "control person" liability under Section 15 of the Securities Act of 1933 or Section 20(a) of the Securities Exchange Act of 1934. *Picard*, 940 F. Supp. at n.13.

allegedly made by them are not actionable and that there is no evidence that either of them acted

with scienter. The Plaintiffs respond that their claims are not time-barred, that both Brooks and

Laura are "sellers" for purposes of the 10b-5 claims and that the statements made were

actionable.

### A.    Timeliness of 10b-5 Claims

The Sarbanes-Oxley Act of 2002 extended the statute of limitations on 10b-5 claims from

a one-year/three-year scheme to a two-year/five year scheme. *Taylor v. Prudential Insurance

Company of America*, No. 1:02-cv-1462, 2003 WL 21314254 at *4 (S.D. Ind. May 7, 2003). The

two-year/five-year scheme currently in effect is found at 28 U.S.C. § 1658. *Id.*

Section 1658 provides that "a private right of action that involves a claim of fraud, deceit,

manipulation, or contrivance in contravention of a regulatory requirement concerning the

securities laws… may be brought not later than the earlier of: (1) 2 years after the discovery of

the facts constituting the violation; or (2) 5 years after such violation." *Id.* (citing 28 U.S.C. §

1658). The limitations period is not subject to equitable tolling and the statute of limitations

begins to run on either actual or inquiry notice of the facts constituting the fraud. *Id.*

To apply the two-year limitation, the date the complaint was filed and the date that the

facts constituting the violation was or should have been discovered must be determined. To

apply the five-year limitation, the date of the violation must be determined.

### 1.    Date When the 10b-5 Claim Was Filed

Plaintiffs' original Complaint was filed in the Court of Common Pleas for Clark County,

Ohio on January 26, 2005, and was subsequently removed to this Court. On July 22, 2005, the

Plaintiffs filed an Amended Complaint which added claims of violation of Sections 12(a)(1) and

12(a)(2) of the Securities Act of 1933 and violation of Rule 10b-5 of the Securities Exchange Act of 1934. On November 2, 2005, the Plaintiffs again amended their Complaint. Following and pursuant to this Court's ruling on Defendants' Motion To Dismiss the Second Amended Complaint, the TAC was filed on April 6, 2006. The TAC adds Brooks as a Defendant and includes the particulars of the allegations of fraud.

Brooks and Laura now argue that the 10b-5 claim was first filed against Laura on July 22, 2005 when this claim was amended to the original Complaint. They also argue that the 10b-5 claim against Brooks was brought on January 18, 2006, when Plaintiffs filed their motion to file the TAC.[12] The Plaintiffs respond that the 10b-5 claim filed against Laura on July 22, 2005, and the TAC which first named Brooks relate back to the original claim filed on January 26, 2005.

The law regarding an amendment relating back to an original claim is as set forth above. In this case, Laura was named in the original Complaint and the Amended Complaint adding the 10b-5 claim against Laura arose out of the conduct, transaction and occurrences set forth in the original Complaint. Therefore, the Amended Complaint that adds a 10b-5 claim against Laura relates back to the original Complaint filed on January 26, 2005. Also, for the reasons stated above regarding the Section 12(a)(1) and 12(a)(2) claims, the 10b-5 claim against Brooks relates back to the original Complaint.

Therefore, for purposes of the 10b-5 claims against both Brooks and Laura, January 26, 2005, the date the Plaintiffs original Complaint was filed, is the date the claims were filed for purposes of 10b-5 statute-of-limitation analysis. Laura was a named Defendant in the original Complaint and the Amended Complaint which first includes a 10b-5 claim against Laura relates

---

[12]The TAC first added Brooks as a Defendant.

back to the original Complaint. Also, Brooks had constructive notice of the original Complaint and the TAC which first named Brooks as a Defendant arose out of the conduct, transactions and occurrences set forth in the original Complaint. The analysis next turns to the date that the facts constituting the 10b-5 violation were or should have been discovered.

### 2. Date When the Alleged 10b-5 Untrue Statements Were Or Should Have Been Discovered

As with the Section 12(a)(1) and 12(a)(2) claims, Brooks and Laura argue that the Plaintiffs were on inquiry notice about the alleged true state of affairs by at least June 2, 2004, when VWE filed for bankruptcy. The Plaintiffs agree that they were on inquiry notice when the Bankruptcy was filed on June 2, 2004. The analysis next turns to when the alleged 10b-5 violations occurred.

### 3. Date When the Alleged 10b-5 Violations Occurred

The alleged 10b-5 violations are misstatements allegedly made by Brooks and Laura in connection with the purchase of Debenture Notes by the Plaintiffs. There are factual allegations that the alleged misstatements by Brooks and/or Laura were made as early as "during the 90s" and continued until VWE filed bankruptcy. (Ed Dep. 41, 61-62, 125-26, 154, 168-70, 190-96 ; Dianne Dep. 17-18, 75-77, 143; David Dep. 82-85.) There are also factual allegations that the sales to the Plaintiffs that resulted from alleged misrepresentations were made on January 1, 1989, September 22, 1992, November 12, 1998, February 17, 1998, December 12, 2000, October 1, 2001 and October 1, 2003. Therefore, the alleged sales were made after the alleged misrepresentations and, as determined above, each of the sales is an alleged violation.

### 4. Analysis of Timeliness of 10b-5 Claims

In this case, the discovery of the facts constituting the alleged violations was made on

June 2, 2004. Two years after this date is June 2, 2006 and the Complaint was filed on January 26, 2005. Therefore, the Complaint was filed within two years of when the facts constituting the alleged violations were discovered and the two-year limitation is satisfied.

The five-year limitation must also be considered. The dates of the alleged violations range from January 1, 1989, to October 1, 2003. Five years after the alleged violations is a range from January 1, 2004, to October 1, 2008.

The claim was filed on January 26, 2005. Therefore, any sales that occurred on or after January 26, 2000, are not subject to the five-year limitation. This includes sales made on December 12, 2000, October 1, 2001 and October 1, 2003. The five-year limitation bars claims for sales made prior to January 26, 2000. This includes the sales made on January 1, 1989, September 22, 1992, November 12, 1998, and February 17, 1998. The analysis next turns to the actionability of the alleged statements made by Brooks and Laura.

**B.      Actionability as 10b-5 Claims**

To be actionable as 10b-5 claims, the Plaintiffs must show that the statements made by Brooks and/or Laura Klimley were material. *City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005), *cert. denied*, 546 U.S. 936 (2005). Plaintiffs must also show that Brooks and/or Laura had a duty to disclose. *Id.*

The analysis next turns to a determination of whether the alleged statements or omissions were material. This is followed by an analysis of whether Brooks and/or Laura had a duty to disclose.

**1.      Relevant Law On Materiality**

A <u>statement</u> is material only if there is a substantial likelihood that "a reasonable investor would have viewed the misrepresentation as 'having significantly altered the total mix of information made available.'" *In re Ford Motor Company Securities Litigation*, 381 F.3d 563, 570 (6th Cir. 2004)(quoting *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997), *cert. denied*, 523 U.S. 1106 (1998)). Likewise, an <u>omission</u> is material if there is "a substantial likelihood that the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Stavroff v. Meyo*, No. 95-4118, 1997 WL 720475 at *4 (6th Cir. Nov. 12, 1997).

Alleged misrepresentations are immaterial "only if they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *In re Ford Motor Company*, 381 F.3d at 570 (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 563 (6th Cir. 2001)). Misrepresentations are also immaterial if the investors have knowledge of the truth. *Picard*, 940 F. Supp. at 1123 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

The materiality requirement does not require proof of a substantial likelihood that proper disclosure would have caused an investor to change a decision. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Proof that the proper disclosure would have significantly altered the "total mix" of available information is all that is necessary. *Id.*

Whether or not a statement is material turns upon a "fact-intensive test." *City of Monroe*, 399 F.3d at 669 (citing *Helwig*, 251 F.3d at 555). Therefore, materiality is a mixed question of law and fact and is decided as a matter of law only if reasonable minds could not differ on the issue. *Picard*, 940 F. Supp. at 1122. However, in most instances, disputes over the materiality of allegedly false or misleading statements are determined by the trier of fact. *Shaw*, 82 F.3d at

-37-

1217.

Regarding materiality, the Sixth Circuit has distinguished between "hard" and "soft" information. *Picard*, 940 F. Supp. at 1122. Hard information is usually historical information or other factual information that is objectively verifiable. *Id.* Publicly-disclosed hard information is actionable if false and material. *Id.*

Soft information includes predictions and matter of opinions. *Id.* Soft information that is not actionable includes vague, puffing statements or obvious hyperbole upon which a reasonable investor would not rely. *In re Ford Motor*, 381 F.3d at 570. Statements that are "mere puffing" or "corporate optimism" may be forward-looking or generalized statements of optimism that are not capable of objective verification. *Id.*

Soft information is actionable only if it is virtually as certain as hard facts. *City of Monroe*, 399 F.3d at 669. Opinions may be deemed false or misleading under the securities laws if proof of their falsity can be established "through the orthodox evidentiary process." *Id.*(citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090-93 (1991)).

## 2.     Relevant Law On Duty To Disclose

In addition to being material, to be actionable, a misrepresentation or omission must pertain to information that the defendant had a duty to disclose. *City of Monroe*, 399 F.3d at 669. A duty to disclose may arise where there is an incomplete or misleading prior disclosure. *Id*. Also, a duty to disclose may arise from a relationship of trust and confidence between the parties to a transaction. *Chiarella*, 445 U.S. at 230; *State v. Warner*, 564 N.E.2d 18, 40 (Ohio 1990), cert. denied, 499 U.S. 961 (1991).

For example, "[a] duty to disclose and corresponding liability for failure to disclose arises

when the party fails to exercise reasonable care to disclose a material fact which may justifiably induce another party to act or refrain from acting, and the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading. *Glassner v. R.J. Reynolds Tobacco Company*, 223 F.3d 343, 352 (6th Cir. 2000). In another example, a duty to disclose arises when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them. *Warner*, 564 N.E.2d at 40.

As an example of a fiduciary duty, the officers and directors of a corporation that is insolvent or is on the brink of insolvency owe a fiduciary duty to the corporation itself and to its creditors not to waste corporate assets which otherwise could be used to pay corporate debts. *DeNune v. Consolidated Capital of North America, Inc.*, 288 F. Supp.2d 844, 859 (N.D. Ohio 2003). In another example, directors of a corporation owe a fiduciary duty to the corporation and its shareholders to perform their duties in good faith and in a manner not opposed to the best interests of the corporation. *Thomas v. Matthews*, 113 N.E. 669, 671 (Ohio 1916); *Geygan v. Queen City Grain Co.*, 593 N.E.2d 328, 331 (Ohio Ct. App. 1991).

Directors are held strictly accountable and liable if corporate funds or property are wasted or mismanaged due to the director's inattention. *Biggins v. Garvey*, 630 N.E.2d 44, 52 (Ohio Ct. App. 1993); *Geygan*, 593 N.E.2d at 333. However, a fiduciary duty does not exist when a bank and a prospective borrower are dealing at arm's length unless special circumstances are present. *Groob v. Keybank*, 843 N.E.2d 1170, 1176 (Ohio 2006).

### 3.    Alleged Fraudulent Statements

The allegedly fraudulent statements or omissions attributed to Brooks and Laura in the

TAC are:

¶ 35. In October of 2000 at the Dutch Reformed Church in Bronxville, New York, after the funeral service of Victor Eimicke, Alicia and Maxine Eimicke and Laura Klimley assured Wayne, Dianne and David Pullins that Alicia Eimicke would run the Company and that the Company was strong financially. At the time that said statements were made, Alicia, Maxine Eimicke and Laura Klimley knew these statements to be false. (See also Ed's deposition where he remembers that a group, including Brooks, discussed that VWE was doing well and he remembers this conversation being at a dinner following Victor's funeral. (Ed. Dep. 122-25.); In her deposition, Dianne remembers that on many social occasions "we" were told by Victor and Brooks "what a great company it is and we should invest." (Dianne Dep. 16-18; David Dep. 82-83.))

¶ 43. On Thursday-Sunday, October 11-14, 2001 at Baker Field, Columbia University, New York City, Brooks and Laura Klimley took Wayne, Dianne and David Pullins to a Columbia University football game. Brooks and Laura Klimley told the Pullins Family that all was well with the company and everything was running as usual although they knew that said representations were false. (See also Ed Dep. 137-39; Dianne Dep. 16-18, 76-78; David Dep. 100-03.)

¶ 61. On Friday, July 4, 2003, at the Siwanoy Country Club in Bronxville, New York, Laura and Brooks Klimley, along with Maxine Eimicke, indicated to Wayne Pullins that the Company was doing better than ever before and Alicia was doing a great job although they knew this not to be the case. (See also Ed Dep. 164; Dianne Dep. 16-18.)

¶ 68. On Tuesday-Friday, April 20-23, 2004, Wayne Pullins was in Columbus, Ohio at Riverside Methodist Hospital for a heart operation. He received separate calls from both Maxine Eimicke and Laura Klimley, wishing him well and not to worry about the money with them, it was safe for his wife and son although they knew that this was not true and in fact that Company was preparing a bankruptcy filing. (See also Dianne Dep. 16-18.)

¶ 70. On Saturday, May 29, 2004, at 5 Oakledge Road (Klimley family residence), Bronxville, New York, the Klimleys held a barbeque at their home, attended by Brooks and Laura Klimley, their three children (Zoe, Spencer, Graham), Beth Duval and Wayne, Dianne and David Pullins. Wayne Pullins asked about the company (because they were behind in payment to the Pullins family for about $17,000). Laura Klimley referred questions to Brooks who said things were "going on as usual." Wayne Pullins asked where Alicia Eimicke was

and was told by Laura that she was unable to attend because of conflicting week-end plans. The guests were shown in detail their $8 million home, acting as if they (Maxine Eimicke and Brooks and Laura Klimley) were entirely secure. In front of Brooks and Laura Klimley, Maxine Eimicke advised the Pullins family to reserve rooms at the Plaza Hotel for David Pullins' upcoming graduation from Columbia University, suggesting money issues were secure. At the time that these representations were made Brooks Klimley, Laura Klimley and Maxine Eimicke knew that the Company was insolvent and had authorized the filing of a bankruptcy petition. (See also Ed. Dep. 168-70; Dianne Dep. 16-18.)

¶ 71. On Sunday, May 30, 2004, in the Bronxville area, to see the Klimley's two sons play baseball, Wayne Pullins asked again about Alicia and the Company. Again, Brooks spoke for Laura Klimley and himself saying, "Alicia runs the company for us and she plays her cards close to the vest." This statement was made although Brooks Klimley was actively involved in the note program and had knowledge of the Company's insolvency and bankruptcy filing. (See also Dianne Dep. 16-18.)

¶ 79. Defendants knew or in the alternative recklessly disregarded the adverse information in connection with the Company's losses, excessive officers salaries and compensation; failure to register the subject Notes and make the required disclosures; inability to service the Notes and the insolvency of the Company as described above and purposely failed to disclose this information to Plaintiffs and the other investors in the Note Program although Defendants had a clear duty to do so.

In addition to the specific instances identified in the TAC, Ed remembers that, during the time prior to Victor's death, Brooks represented to him that VWE was doing well. (Ed Dep. 62.) Ed does not identify when this particular statement may have been made.

Ed also testified that Brooks confirmed with Maxine that there were $4 million in notes outstanding and VWE had plenty of assets to cover that. (Id. 118.) Ed does not testify as to when this particular statement was made. (Id.)

### 4. Analysis of Actionability of Fraudulent Statements

As an initial matter, the alleged general representations made by Brooks and identified in Ed's deposition at pages 62 and 118 will not be considered to be material because Ed does not

identify the statements with specificity. Remaining to be considered are the specific statements and omissions alleged in the TAC and confirmed in the Depositions of Ed, Dianne and David.

This analysis is undertaken based upon factual allegations that both Laura and Brooks knew or should have know the true financial status of VWE. Laura was a 50% owner, a Vice President of VWE, a Director of VWE and worked in the business every day for a period of time. (See Dianne Dep. 107-08.)

Leo Kirby, a VWE employee from May of 1993 to July of 2000, testifies that, as part of his job duties, he delivered business items, including interoffice envelopes and mail messages, to Laura's home and that he saw an office in her home in which she did VWE business-related work. (Deposition of Leo Kirby ("Leo Kirby Dep.") 64 May 1, 2007.) He, however, does not know the contents of the materials that he delivered. (Id. 42.) He also recalls occasionally discussing business matters with Laura in VWE's office after she ceased working full time there. (Id. 34-35) Dianne also recalls seeing the office in Laura's home and financial documents on Laura's desk. (Dianne Dep. 73-74.) Finally, David recalls seeing the office that Laura had in her home and describes it as a "business-like" office with a fax machine and computer and as "not an office for writing thank you notes." (David Dep. 117.)

Further, in a recent deposition in an different lawsuit, Laura acknowledges that she was consulted by Alicia in connection with issues involving VWE's business affairs in the 1998 to 2004 time period. (Deposition of Laura Klimley ("Laura Dec. Dep.") 34 Dec. 5, 2007.) She also admits that she had signatory power on VWE accounts after Victor's death and that, in October of 2000, she actually signed checks to holders of the Debenture Notes . (Id. 223-25.) Laura also admits that, in mid-2003 she attended at least one meeting regarding the sale of VWE's Holiday

-42-

Greeting Card business. (Id. 205, 276.) Finally, Laura admits that, up until VWE's bankruptcy was filed, she was receiving a weekly check from VWE for $600. (Id. 41.) She does not think this money was a salary but was money VWE owed her for something other than a Debenture Note. (Id. 41-42)

Further, regarding Laura, there is evidence that she was told by lawyers in the firm of Hall Dickler Kent Goldstein & Wood that, as of August 27, 2001, VWE had significant net operating losses of approximately $8.6 million, a book value of approximately $11 million and outstanding liabilities of approximately $24 million.. (Affidavit of Michael Meyers ("Meyers Aff.") ¶¶ 3-4, Ex.1 Nov. 9, 2007). This information was presented as part of a response to a request from VWE, half-owned at the time by Laura, to present the most tax efficient business structure under which VWE could achieve certain goals in the event it became profitable and/or was later sold at a substantial gain. (Id.)

There are also factual allegations that Brooks was knowledgeable in general about financial matters and heavily involved in and knowledgeable of VWE financial matters. (Dianne Dep. 16-17, 77, 107-08; David Dep. 82-83, 102-04; Romo Aff. ¶¶ 3-4.)

Because Laura and Brooks knew or should have known about VWE's poor financial conditions, their statements identified in paragraphs 35, 43, 61, 68, 70 and 71 of the TAC are misrepresentations. While in one context, these statements may be mere "rosy affirmations," in the context of a family business where no financial information is officially disclosed and where the alleged misstatements are made by those close to the family who knew or should have known the actual financial conditions, there are not mere "rosy affirmations." Also, while the majority of the alleged misrepresentations were made by Victor, Maxine and Alicia, there are factual

-43-

allegations that Laura and Brooks knew or should have known that they were misrepresentations and either supported or failed to correct them. Finally, proper disclosure of the financial status of VWE would have significantly altered the total mix of information available to Ed, Dianne and David upon which to base their decisions regarding purchase and/or renewal of the Debenture Notes. Finally, failure to disclose the true financial picture when given many opportunities to do so is a material omission.

Regarding duty, both Brooks and Laura had a duty to disclose VWE's true financial status to the Plaintiffs because they had made alleged misleading prior disclosures regarding the financial status of VWE. Both Brooks and Laura also had a duty to disclose arising from the relationship of trust that they created due to their close family relationship with the Plaintiffs, Plaintiffs continuing purchase of Debenture Notes and Brooks' and Laura's prior affirmations of VWE's financial well-being. Further, both Brooks and Laura, as control persons of a insolvent company, had a fiduciary relationship with Plaintiffs as creditors and, therefore, had a duty to disclose. Finally, Laura had a duty to disclose that arose from the positions that she held at VWE and the fact that the Plaintiffs were both investors and close family members.

### 5. Conclusion On Actionability

There are genuine issues of material fact as to whether the alleged misstatements and omissions made by Brooks and Laura are actionable. There are genuine issues of material fact as to whether the statements were  material and genuine issues of material fact as to whether Brooks and/or Laura had a duty to disclose the true financial status of VWE.

### C. Scienter Regarding the 10b-5 Claims

To prove their 10b-5 claim, Plaintiffs must show that Brooks and/or Laura acted with the

requisite scienter. Scienter is defined as "a mental state embracing intent to deceive, manipulate or defraud." *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 917 (6th Cir. 2007); *Picard*, 940 F. Supp. at 1125. For 10b-5 claims based on statements of present or historical fact, scienter consists of knowledge or recklessness. *PR Diamonds v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004). Recklessness is akin to conscious disregard and is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Id.* at 684. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." *Id.* at 681 (quoting *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979)). For forward-looking statements that are not accompanied by meaningful cautionary language, the required state of mind is actual knowledge of the statement's false or misleading nature. *Id.* at n.3.

A "totality of the circumstances" test is used to determine whether scienter is adequately shown. *Brown*, 481 F.3d at 917. Among the factors that have been considered to determine if scienter was present are: divergence between internal reports and external statements on the same subject; closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; disregard of the most current factual information before making statements; and the self-interested motivation of the defendants in the form of saving their salaries or jobs. *Id.* at 917.

Scienter must be shown for each of the statements allegedly made by Brooks and Laura. *City of Monroe*, 399 F.3d at 682. The Plaintiffs must allege facts that, if true, form the basis for a strong inference that Brooks and/or Laura knew a statement was false or misleading.

In this case, the Plaintiffs have alleged facts that both Laura and Brooks knew or should

have known that their statements regarding the financial health of VWE were false and that both Brooks and Laura may have been motivated to make the false statements. This same reasoning applies to the alleged omissions.

First, there is evidence that Brooks knew or should have known about the actual financial condition of VWE. There is evidence that, in 1994 at a party at Maxine's home, the group present "toasted" to the "handing of the guard over to Brooks and the girls."[13] (Dianne Dep. 107-08.) The Eimickes, the Pullins and Brooks Klimley were in attendance. (Id.)

Dianne testified that, on social occasions, Brooks and Victor discussed the financial aspects of VWE and said what a great company it was. (Dianne Dep. 16-17.) Dianne also testified that, after Victor's death, Brooks told her and others not to worry that he would take care of the family's money and that he had it right under his thumb. (Dianne Dep. 108; David Dep. 82-83.)

Ed testified that, on one occasion, Brooks told him that VWE was "running fine." (Ed Dep. 41.) On other occasions, Brooks told Ed that VWE was a great business and highly profitable. (Id. 62.) On other occasions, Brooks launched into a dialogue about VWE's financials. (Ed Dep. 160-61, 170; Dianne Dep. 77; David Dep. 102-04.) In addition to evidence recalled by Ed, Dianne and David, Brooks allegedly told Terence Cyran that VWE was a "pioneer" in the direct mail industry with "huge" margins and had been highly and consistently profitable for many years. (Verified Comp. of Terence Cyran ¶ 12.) Brooks also told Terence Cyran that the lack of financial disclosure regarding VWE should not be a concern given the

_____

[13]The Defendants argue that this testimony should not be considered because it is hearsay. However, it is not hearsay because Dianne Pullins did not identify who, if anyone, made a statement.

-46-

long profitable history of the business. (Id. ¶ 21.) In addition, Brooks told Thomas Romo that VWE had been highly and consistently profitable for many years. (Verified Compl. of Thomas Romo ¶ 7.)

Laura also knew or should have known about the financial condition of VWE. There is evidence that she owned 50% of VWE, she was a Director of VWE, she was a Vice President of VWE and, for a period of time, she worked at VWE on a daily basis. There is also evidence that, after Laura ceased working full-time, she continued to be involved in the operation of VWE.

There is also evidence that both Brooks and Laura had financial motivation to make misrepresentations or fail to provide material information. Laura was half-owner of VWE and received a regular payment and other benefits from VWE. Both Brooks and Laura owned several of the Debenture Notes and benefitted from continuing to receive interest payments on the notes. (Plts.' Mem. In Opposition To Brooks Klimley Mot. for Summ. J. Exs. A, B.) Finally, as Laura's spouse, Brooks would indirectly benefit from the income and profits she received from VWE.

### D.    Conclusion Regarding 10b-5 Claims

The five-year statute of limitations bars Plaintiffs' 10b-5 claims for Debenture Notes purchased prior to January 26, 2000. However, action on the Debenture Notes purchased by the Plaintiffs on or after January 26, 2000, is not barred by the statute of limitations.  This includes purchases made on December 12, 2000, October 1, 2001 and October 1, 2003.

With regard to the Debenture Notes purchased on or after January 26, 2000, the Plaintiffs have presented evidence the misrepresentations and/or omissions made by both Brooks and Laura are material and that Brooks and Laura owed them a duty to disclose the actual financial condition of VWE. The Plaintiffs have also presented evidence that both Brooks and Laura may

have acted with a mental state embracing an intent to deceive, manipulate or defraud with regard to these misrepresentations and/or omissions and that Brooks and Laura had the financial incentive to do so. Therefore, there are genuine issues of material facts and Brooks and Laura are not entitled to judgment as a matter of law on Plaintiffs' Second Cause of Action for violation of Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5.

## VI. THIRD CAUSE OF ACTION: VIOLATION OF SECTION 15 OF THE SECURITIES ACT OF 1933

In Plaintiffs' Third Cause of Action, they allege that Brooks and Laura were control persons of VWE and therefore secondarily liable for any misrepresentations made by Victor, Maxine or Alicia. The Defendants argue that neither Brooks nor Laura were control persons.

Section 15 applies to violations of Section 12 of the Securities Act of 1933. *Herm v. Stafford*, 663 F.3d 669, 679 (6th Cir. 1981). In this case, Brooks and Laura Klimley have been granted summary judgment on the Section 12 claims brought directly against them. However, Brooks and Laura may be liable as control persons for the Section 12 claim that is not time-barred.

Courts analyze control-person-liability claims brought under Section 15 of the Securities Act of 1933 and control-person-liability claims brought under Section 20(a) of the Securities Exchange Act of 1934 using the same legal standards. *See Maher*, 144 F.3d at 1304-05; *In re Enron Corporation Securities, Derivative & "ERISA" Litigation*, Nos. MDL-1446 and Civ.A. H-01-3624, 2003 WL 230688 at * 12 (S.D. Tex. Jan. 28, 2003)(the Fifth Circuit has held that Section 15 and Section 20(a) are analogous and should be interpreted in the same manner); *Picard*, 940 F. Supp. at 1133-34; *Maywalt*, 808 F. Supp. at 1053-54. Also, the Parties in this case have not argued otherwise. Therefore the law regarding Section 15 and Section 20(a) claims will

be set forth and applied to both Plaintiffs' Section 15 and Section 20(a) claims.

### A.     Relevant Law On Control Person Liability

Under Section 15 of the Securities Act of 1933 and Section 20(a) of the Securities Exchange Act of 1934, a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable with the primary violator. *Maher*, 144 F.3d at 1304-05.[14] To state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) "control" over the primary violator by the alleged controlling person. *Id.* (citing *First Interstate Bank v. Pring*, 969 F.2d 891, 897 (10th Cir. 1992)); *see also PR Diamonds v. Chandler*, 364 F.3d 671, 696-97 (6th Cir. 2004).

A plaintiff is not required to show that the defendant "acted or culpably participated in the primary violation." *Maher*, 144 F.3d at 1305. Only some indirect means of discipline or influence short of actual direction is required to hold a controlling person liable. *Id.* Further, status as a control person is normally a question of fact unless the allegations are unusually explicit and the court can determine that the plaintiff could not plead or prove sufficient facts to support control-person liability. *Sanders Confectionery Products v. Heller Financial, Inc.*, 973 F.2d 474, 485-86 (6th Cir. 1992).

Having set forth the standard for control person liability, the analysis turns a determination of who is liable as a control person. "Control" has been defined by the Securities and Exchange Commission as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. *PR Diamonds*, 364 F.3d at 696-97 (citing 17 C.F.R.

---

[14]Section 15 and Section 20(a) are remedial and thus construed liberally. *Maher*, 144 F.3d at 1305.

§ 230.405). "Control," therefore, is the practical ability to direct the actions of the individuals

who committed the primary violation. *In re National Century Financial Enterprises, Inc.*

*Investment Litigation*, 504 F. Supp.2d 287, 30 (S.D. Ohio 2007)(citing *Stavrof*, 1997 WL 720475

at n.5.)

   The Sixth Circuit has not adopted a test for control-person liability but has applied the

test set forth in *Metge v. Baehler*, 762 F.2d 621 (8th Cir. 1987) because it was the least rigorous

standard used at that time. *Sanders*, 973 F.3d at 486. *Metge* established a two-pronged test for

control person liability. *Id.* The plaintiff must show that the defendant "actually participated in

(i.e. exercised control over) the operations" in general and "that the defendant possessed the

power to control the specific transaction or activity upon which the primary violation is

predicated." *Id.* (quoting *Metge*, 762 F.2d at 631.)

   "To establish the first prong of the test, the plaintiff must show that the defendant had

some indirect means of discipline or influence, even if short of actual directions, over the

corporation."[15] *Picard*, 940 F. Supp. at 1134 (citing *Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir.

1967), *cert. denied*, 390 U.S. 951 (1968)). In short, there must be some showing of actual

participation or some influence before control may be imposed. *Id.*

   The Plaintiffs cite *In re National Century*, 504 F. Supp.2d 287,[16] for the proposition that

_____

   [15]The Defendants cite *Herm v. Stafford*, 663 F.2d 669 (6th Cir. 1981) for the proposition
that allegations of an actual exercise of control are necessary to survive a motion for summary
judgment. However, in *Herm*, the court granted a motion for summary judgment against a
Section 20(a) claim because the plaintiff failed to present evidence of the defendant's
"influence" or "actual participation in the corporation's operations." *Id.* at 684.

   [16]The Plaintiffs actually cite *In Re National Century Financial Enterprise, Inc.*, 2006 U.S.
Dist. LEXIS 72154 (S.D. Ohio 2006) but this case says nothing about control person liability and
it appears that Plaintiffs may have intended to cite *In re National Century Financial Enterprises,
Inc.*, 504 F. Supp.2d 287 (S.D. Ohio 2007).

it is not necessary to show actual participation or the exercise of actual power to prove control person liability. However, this particular argument is not persuasive. The *National Century* court was identifying a pleading standard relative to a motion to dismiss. *Id.* at 303. The *National Century* court did, however, acknowledge that *Herm* required evidence of "influence or actual participation in the corporation's operation" in order to survive a motion for summary judgment. *Id.* at n.3.

### B.  Primary Violation

The Plaintiffs have presented factual allegations that Victor, Maxine and Alicia violated Section 12(a)(2) of the Securities Act of 1933 by making material misstatements or omissions regarding the sale of the Debenture Notes. These allegations are not disputed by the Defendants. Therefore, for purposes of the Defendants' Motions for Summary Judgment, a primary violation of Section 12(a)(2) will be assumed to have occurred. The analysis next turns to whether Brooks and/or Laura had control over Victor, Maxine and Alicia Eimicke.

To survive a motion for summary judgment regarding control person liability, the Plaintiffs must present evidence that Brooks and/or Laura actually participated in or had some involvement in the operations of VWE in general and that Brooks and/or Laura possessed the power to control Victor, Maxine and Alicia's misstatements and/or omissions regarding sale of the Debenture Notes.

### C.  Brooks as a Control Person

Brooks argues that he did not act in any capacity for VWE, and that his only relationship to VWE was by being married to Laura. The Plaintiffs respond that Brooks was in charge of overseeing VWE's financial affairs and represented to the Plaintiffs and others that he was doing

so.

First, there is evidence that Brooks was involved in the financial affairs of VWE. There is evidence that, in 1994 at a party at Maxine's home, the group present "toasted" to the "handing of the guard over to Brooks and the girls." (Dianne Dep. 107-08.) The Eimickes, the Pullins and Brooks Klimley were in attendance. (Id.) In addition, Dianne testifies that, on social occasions, Brooks and Victor discussed the financial aspects of VWE and said what a great company it was. (Dianne Dep. 16-17.) Dianne Pullins also testifies that, after Victor's death, Brooks told her and others not to worry that he would take care of the family's money and that he had it right under his thumb. (Dianne Dep. 108; David Dep. 82-83.)

Ed testifies that, on one occasion, Brooks told him that VWE was "running fine." (Ed Dep. 41.) On other occasions, Brooks told Ed that VWE was a great business and highly profitable. (Id. 62.) On other occasions, Brooks launched into a dialogue about VWE's financials. (Ed Dep. 160-61, 170; Dianne Dep. 77; David Dep. 102-04.)

In addition to evidence recalled by Ed, Dianne and David, Brooks allegedly told Terence Cyran that VWE was a "pioneer" in the direct mail industry with "huge" margins and had been highly and consistently profitable for many years. (Verified Comp. of Terence Cyran ¶ 12.) Brooks also told Terence Cyran that the lack of financial disclosure regarding VWE should not be a concern given the long profitable history of the business. (Id. ¶ 21.) In addition, Brooks told Thomas Romo that VWE had been highly and consistently profitable for many years. (Verified Compl. of Thomas Romo ¶ 7.) Finally, Brooks has testified that, on at least one occasion, he, at Alicia's request, discussed VWE with a potential buyer of VWE's Debenture Notes. (Brooks Dec. Dep. 166-68.)

In addition to the above deposition testimony, the Plaintiffs have identified evidence that Brooks was involved in the operation of VWE in the form of nineteen VWE quarterly interest checks written to various debenture holders that are allegedly signed by Brooks. (Affidavit of Barbara DeMuth ("DeMuth Aff.") Ex. 14 Oct. 11, 2007; Ed Aff.") ¶ 7.) Brooks' signature on the checks is identified by Ed. (Ed. Aff. ¶ 7.) Barbara DeMuth also attests that she recognizes the signatures on the checks in Ex. 14 to her Affidavit as the signatures of Alicia Eimicke, John Palmero, Laura Klimley and that these checks were signed at a time when Brooks Klimley, "who likewise appears to have signed these checks," was in VWE's offices. (DeMuth Aff. ¶ 18.)

Brooks testified that he did not sign the checks attached to DeMuth's Affidavit and Laura affirms that she did. (Supplemental Affidavit of Brooks Klimley ("Brooks Supp. Aff.") ¶ 7 Nov. 13, 2007; Supplemental Affidavit of Laura Klimley ("Laura Supp. Aff.") ¶ 3 Nov. 13, 2007.) In addition to arguing that he did not sign the checks, Brooks argues to disregard Ed's Affidavit wherein he identifies Brooks' signature. This Affidavit should be disregarded according to Brooks, because it was untimely, it is not signed or notarized and because Ed Pullins did not establish the foundation necessary for him to conclude that the signature belonged to Brooks.

As to timeliness, signature and notarization, the first page of Ed's Affidavit was filed on October 22, 2007, along with Plaintiffs' responses to Defendants' Motions for Summary Judgment. (Doc. #132.) A complete Affidavit was then filed on November 5, 2007, but included typed rather than original affiant and notary signatures. (Doc. #139.) On November 21, 2007, a complete Affidavit was filed that was notarized and included an original signature. (Doc. #155.) The manner in which Ed's Affidavit was filed is not necessarily acceptable to this Court. However, the Defendants are obviously aware of, and therefore, not prejudiced by the late filing

of the complete Affidavit and the interests of justice demand that the Affidavit not be disregarded based upon the manner in which is was filed.

As to the foundation for Ed's Affidavit, a nonexpert may be permitted to state an opinion as to the authenticity of handwriting with which he or she is familiar provided that the familiarity is not acquired for the purpose of litigation. *United States v. Binzel*, 907 F.2d 746, 749 (7th Cir. 1990). The extent of the witnesses' familiarity generally goes to the weight to be given to the testimony but there must be a minimal factual basis from which the familiarity might reasonably have been obtained. *Id.* Finally, the nonexpert witness must identify with particularity any documents that are relied upon to establish familiarity. *Hall v. United Insurance Company of America*, 367 F.3d 1255, 1261 (11th Cir. 2004).

In his Affidavit, Ed affirms that Laura is his niece and Brooks her husband and that he is familiar with their signatures because he has received correspondence from both for many years prior to filing this lawsuit. This is enough foundation. Ed indicates that he is familiar with Brooks' and Laura's signatures and identifies the documents that he relied upon to establish the familiarity. Any further familiarity issues go to the weight to be given to Ed's testimony and are not properly determined at summary judgment.

Brooks argues that former VWE employees who were actually present at VWE testified that they almost never saw Brooks at VWE and that they had no knowledge of Brooks having involvement in or responsibility for VWE. However, this, of course, is not conclusive proof that Brooks was not a control person, particularly when faced with evidence to the contrary.

The Plaintiffs have presented evidence that Brooks participated in or had some involvement in the operation of VWE in general and that Brooks had the power to control

Victor, Maxine and Alicia's misstatements and/or omissions regarding sale of the Debenture Notes. There is evidence that "Brooks and the girls" were running VWE and that Brooks held himself out to others as knowledgeable about the financial status of VWE. Further, there is evidence that, on at least one occasion, Brooks discussed VWE with a potential buyer of VWE Debenture Notes. Finally, there is evidence that Brooks signed checks on VWE accounts issued to holders of VWE Debenture Notes. Therefore, there are genuine issues of material facts and Brooks is not entitled to judgment as a matter of law on Plaintiffs' claim that he was a control person pursuant to Section 15.

### D.  Laura as a Control Person

Laura argues that she is not a control person of VWE because, at all relevant times, she did not participate in the management and operations of VWE. However, the Plaintiffs have presented evidence otherwise.

Laura owned half of VWE. She also was a Director of VWE until she resigned in a letter dated September 9, 2004 (Laura Dep. Ex. 1.) and a Vice President of VWE until she resigned in a letter date September 28, 2004 (Id. Ex. 2.).

Laura affirms that she worked full-time at VWE from 1985 until 1996 and worked part time thereafter until 1999. (Laura Aff. ¶ 7.) She recalls very little regarding her involvement in VWE after 1999. She admits that she was a Vice President of VWE but doesn't recall who appointed her, why she was appointed or what her duties were. (Laura Dep. 39.) She also admits that she was a director of VWE but she claims that she did not know what her duties were and had no idea how VWE's Directors were appointed. (Id. 78, 122.) Finally, she acknowledged that she was the owner of VWE common and preferred stock but does not know how she acquired

the stock. (Id. 74-75.)

Documents submitted by the Plaintiffs describe more involvement in VWE by Laura after 1999 than she remembers. She allegedly received business correspondence at an office that she had at her home, she allegedly signed checks to Debenture Note holders, she allegedly participated in the sale of the Greeting Card Business and she allegedly received a weekly check from VWE after 1999.

In addition, Minutes of Annual Meetings of Stockholders for the years 2000, 2001, 2002 and 2003 indicate that Laura was present for each, that Laura was an officer and employee of VWE, that Laura was elected a director for the next year and that she reviewed and approved the Financial Report for the preceding fiscal year. (DeMuth Aff. Ex. 16.) Minutes of the Annual Meeting of Directors for the years 2000, 2001, 2002 and 2003 indicate that Laura was present, that she was elected as Vice President for the following year, that she reported on "list management and organizational structure/personnel" and that she reviewed and approved VWE's Financial Statements for the previous fiscal year. (Id.) The Minutes of the Shareholder and Director annual meetings are signed by Alicia (Barbieri) Klimley and Maxine Klimley. (Id.) Included in the records submitted by the Plaintiffs are "Waiver of Notice" forms waiving notice of the 2000, 2001, 2002, and 2003 Stockholders and Directors annual meetings. (Id.) Each of the waivers is signed by Laura.[17] (Id.; see also Laura Supp. Aff. ¶ 6 Nov. 13, 2007.)

In addition to the documents regarding VWE annual shareholder and director meetings, the Plaintiffs have submitted VWE's Federal Income Tax Returns for the years 2002 and 2003. (Demuth Aff. Ex. 12, 13.) These tax returns are signed by Alicia Eimicke as President of VWE

---

[17]The signature on the waiver for the 43rd Annual Meeting of the Directors appears to be different from the signature on the other waivers.

and report to the Government that Laura was an officer of VWE and devoted 100% of her time to the business.

### 1.      Objection To Barbara DeMuth's Affidavit

The meeting minutes and waivers and the tax returns were submitted as attachments to Barbara DeMuth's Affidavit. The Defendants object to Barbara DeMuth's Affidavit arguing that it fails to establish her competency to attest to the elements of the business-records exception and because she does not affirm that the minutes were created by a person with knowledge of the transaction or from information transmitted by a person with knowledge.

Records prepared in the course of regularly conducted business are particularly reliable because the person preparing the record has an incentive to be accurate. *United States v. Weinstock*, 153 F.3d 272, 276 (6th Cir. 1998). Therefore, the Federal Rules of Evidence provide an exception to the inadmissibility of hearsay for business records.

The business record exception sets forth the following four requirements for admissibility of documents that are otherwise hearsay: (1) the document must have been made in the course of a regularly conducted business activity; (2) the document must have been kept in the regular course of that business; (3) the regular practice of that business must have been to have made the document; and (4) the document must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge. *United States v. Jenkins*, 345 F.3d 928, 935 (6th Cir. 2004)(citing Fed. R. Evid. 803(b)). Also, the document must be presented through "the testimony of the custodian or other qualified witness[.]" *Id.* (quoting Fed. R. Evid. 803(6)). The "other qualified witness," if applicable, is not required to have control of the record or personal knowledge of the preparation of the record but is required to be familiar

with the record keeping procedures of the organization. *Id.* (citing *Dyno Construction Co. v. McWane, Inc.*, 198 F.3d 567, 575-76 (6th Cir. 1999)); *Weinstock*, 153 F.3d at 276.

Business records meeting the criteria set forth in Fed. R. Evid. 803(6) are admissible "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." *Id.* (quoting Fed. R. Evid. 803(6)). The trial court is given "great latitude" on evidentiary rulings regarding trustworthiness and federal law favors the admission of evidence which has any probative value. *United States v. Hathaway*, 798 F.2d 902, 906 (6th Cir. 1986).

### 2.    Analysis of the Admissibility of Barbara DeMuth's Affidavit

A review of the Affidavit of Barbara DeMuth indicates a sufficient basis to qualify the meeting minutes, waivers and income tax returns as business records. Barbara DeMuth affirms that she was employed by VWE from 1979 until 2004 as the accounts receivable supervisor and that she worked with John Palmero and Alicia Eimicke on a daily basis. (DeMuth Aff. ¶ 2.) She affirms that she became "intimately" familiar and has extensive knowledge of the creation and maintenance of VWE's banking records, accounts receivable records, records in connection with VWE's sale of unregistered debentures, sales reports and other like general business records. (Id. ¶ 3.) She affirms that she viewed numerous documents hand-written and/or signed by John Palmero, Maxine Eimicke, Alicia Eimicke and Laura Klimley and "is very familiar with and recognizes on sight, their handwriting and signature." Id. ¶ 4. She then identifies the 2003 and 2004 VWE tax returns as documents prepared by John Palmero in the regular performance of his job duties. (Id. ¶¶ 16, 17.) She also identifies the signatures on the 2000, 2001, 2002 and 2003 Shareholders and Directors Meeting Minutes and waivers as those of John Palmero, Maxine Eimicke, Alicia Eimicke and Laura Klimley. (Id. ¶ 20.) She further affirms that these records

were prepared by Loretta Buscarino, VWE's secretary, in the regular performance of her job duties at or near the dates set forth and were kept in the course of the regularly conducted activity of VWE.(Id.) Loretta Buscarino confirms that, although she did not attend the meetings, she typed the minutes based upon notes given to her by those who did attend. (Buscarino Dep. 33-39, 74-75.)

As an "other qualified witness," Barbara DeMuth presents evidence that she is familiar with the record keeping procedures of VWE. Further, she affirms that the documents in question were made in the course of a regularly conducted business activity and were kept in the regular course of that business. Further, Barbara DeMuth's recognition of the signatures on the documents is but one indication that the regular practice of VWE must have been to have made the documents. The signatures on the documents and the affirmation that VWE's secretary prepared the documents indicate that the documents were made by a person with knowledge of the transaction or from information transmitted by a person with knowledge.

The Defendants attempt to discredit DeMuth's Affidavit by identifying testimony that she gave at an examination conducted by the Official Committee of Unsecured Creditors in *In re VWE Group, Inc.*. (DeMuth Dep. Ex. C 37.) In response to the question, "Do you know if the company kept corporate books and minutes," DeMuth responded, "I don't know." She was then asked, "You don't know," to which she responded, "Not that I know of." (Id.) This general line of questions without any signed documents to view is far different from the specific documents that DeMuth identifies in her Affidavit and does not serve to discredit DeMuth's identification of the meeting minutes, waivers and tax returns.

The Defendants continue to attempt to discredit DeMuth's Affidavit by discussing what

DeMuth actually did for VWE, who actually typed minutes, and DeMuth's alleged recantation of allegations that she had made in another affidavit. However, rather than going to the trustworthiness of the Affidavit in question, these arguments go to the weight to be given the evidence and can be made, if appropriate, in cross examination.

### 3. Analysis of Laura's Control Person Liability

Minutes of the Shareholders and Directors Meetings from 2000 to 2003, waivers for these meetings from 2000 to 2003, and the federal income tax returns for 2002 and 2003 will be considered. These documents along with Laura's 50% ownership, Directorship, Vice-Presidency and participation in VWE's business affairs during this same time period are evidence that Laura participated in the operations of VWE and possessed the power to control what was said or unsaid with regard to sale of the Debenture Notes. There is, therefore, evidence that Laura is subject to control person liability.

In moving for summary judgment, the Defendants present evidence that Laura did not actively participate in the operation of VWE at times relevant to the actionable Section 12(a)(2) claims. Resolving this dispute of fact is for the trier of fact. Therefore, there are genuine issues of material fact and Laura is not entitled to judgment as a matter of law on Plaintiffs claim that she was a control person pursuant to Section 15.

### E. Conclusion On Section 15 Control Person Claim

There are genuine issues of material fact as to whether Brooks and/or Laura were control persons pursuant to Section 15. Therefore, Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Third Cause of Action for violation of Section 15 of the Securities Act of 1933 is OVERRULED.

-60-

## VII.  FOURTH CAUSE OF ACTION: VIOLATION OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

In Plaintiffs' Fourth Cause of Action, they allege that Brooks and Laura were control persons of VWE and therefore secondarily liable for any misrepresentations made by Victor, Maxine or Alicia with regard to their 10b-5 Claims. The Defendants argue that neither Brooks nor Laura were control persons and the Plaintiffs respond that they were.

Section 20(a) applies to claims brought under the Securities Exchange Act of 1934 such as Plaintiffs 10b-5 claims. *Herm*, 663 F.2d at 679. Plaintiffs' 10b-5 claims against both Brooks and Laura have survived summary judgment and the Sixth Circuit has observed without deciding that there is some authority that a plaintiff may not be able to simultaneously assert both 10b-5 claims and Section 20(a) claims. *PR Diamonds*, 364 F.3d at n.4. However, since this is a summary judgment proceeding and not a trial, whether Brooks and Laura are liable, if at all, directly under Section 10b-5 or as control persons under Section 20(a) will be left for a jury to decide.

As set forth above, courts analyze control-person-liability claims brought under Section 15 of the Securities Act of 1933 and control-person-liability claims brought under Section 20(a) of the Securities Exchange Act of 1934 using the same legal standards and the Parties in this case have not argued otherwise. Therefore, the law and conclusions set forth above with regard to Plaintiffs' Section 15 claims apply to Plaintiffs' Section 20(a) claims.

There are genuine issues of material fact as to whether Brooks and/or Laura were control persons under Section 20(a) of the Securities Exchange Act of 1934. Therefore, Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Fourth Cause of Action for violation of Section 20(a) of the Securities Exchange Act of 1934 is OVERRULED.

## VIII.  FIFTH CAUSE OF ACTION: FRAUD

In Plaintiffs' Fifth Cause of Action, they allege that Brooks and Laura made material misrepresentations and/or omissions in an attempt to induce them to invest in VWE in violation of common law. The Defendants argue that neither Brooks nor Laura had a duty to disclose, that the statements attributed to Brooks and Laura were not material and that there is no evidence that either Brooks or Laura acted with the required scienter. The Plaintiffs respond that both Brooks and Laura had a duty to disclose, that the statements by both Brooks and Laura were material and that they both acted with the required scienter.

The elements of a common law fraud claim are:

(1) a representation or, where there is a duty to disclose, concealment of a fact,

(2) which is material to the transaction at hand,

(3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

(4) with the intent of misleading another into relying upon it,

(5) justifiable reliance upon the representation or concealment, and

(6) a resulting injury proximately caused by the reliance.

*Glassner*, 223 F.3d at 352; *Russ v. TRW, Inc.*, 570 N.E.2d 1076, 1083  (Ohio 1991). Further, a representation which may serve as a basis for common-law fraud includes spoken or written words and conduct that amounts to an assertion not in accordance with the truth. *Russ*, 570 N.E.2d at 1084.

As determined above, there are questions of fact regarding whether the oral statements and omissions attributed to Brooks and Laura were material. Also, as determined above, there are questions of fact as to whether Brooks and Laura had a duty to disclose VWE's true financial

condition to the Plaintiffs. Also, as determined above, there are questions of fact as to whether Brooks and Laura acted with the requisite scienter. Finally, Brooks and Laura do not dispute, for purposes of their Motions for Summary Judgment, that the remaining elements of a common law fraud claim are satisfied. Therefore, there are genuine issues of material fact and Brooks and Laura are not entitled to judgment as a matter of law on Plaintiffs' common law fraud claim.

## IX.    SIXTH CAUSE OF ACTION: CIVIL CONSPIRACY

In Plaintiffs' Sixth Cause of Action, they allege that Brooks and Laura engaged in a conspiracy to illegally deprive them of their property through a pattern of fraud and corrupt activity. Brooks and Laura argue that the Plaintiffs cannot establish their conspiracy claims.

### A.    Relevant Law Regarding Civil Conspiracy

A civil conspiracy claim serves to enlarge the pool of potential defendants from whom a plaintiff may recover. *Gosden v. Louis*, 687 N.E.2d 481, 497-98 (Ohio Ct. App. 1996). Also, a civil conspiracy claim may constitute an aggravation which may tend to increase the amount of damages available to the plaintiff. *Id.*

A civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Aetna Casualty and Surety Company v. Leahey Construction Company, Inc.*, 219 F.3d 519, 534 (6th Cir. 2000)(quoting *Kenty v. Transamerica Premium Insurance Company*, 650 N.E.2d 863, 866 (Ohio 1995)). Thus, the elements of a civil conspiracy claim are: (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Id.* (quoting *Universal Coach, Inc. v. New York City Transit Authority, Inc.*, 629 N.E.2d 28, 33 (Ohio Ct. App. 1993)). Finally, knowledge of a wrongful purpose is a crucial element in conspiracy cases. *Id.*

-63-

To satisfy the "malicious combination" element, actual knowledge must be shown and may be shown by circumstantial evidence. *Aetna*, 219 F.3d at 536. As a result, evidence showing that a defendant should have known is not enough. *Id.* However, only a common understanding or design or shared conspiratorial objective need be shown. *Aetna*, 219 F.3d at 538. Finally, the malice may be imputed to a common design by two or more persons to harm another and need not be proved separately. *Gosden*, 687 N.E.2d at 496.

The fourth element, "[i]n a way not competent for one alone" means that, if one person could lawfully commit an act, then that act, if committed by two or more persons cannot support a conspiracy claim. *Gosden*, 687 N.E.2d at 497. Said another way, if the claim regarding the underlying unlawful act fails, the conspiracy claim must also fail. *Wolfer Enterprises, Inc. v. Overbrook Development Corp.*, 724 N.E.2d 1251, 1255 (Ohio App. Ct. 1999).

### B.    Analysis of Conspiracy Claim

In this case, the Plaintiffs have presented evidence that satisfies the second, third and fourth elements of a conspiracy claim. Brooks and Laura do not argue otherwise regarding second and third elements for purposes of their Motions for Summary Judgment.

Brooks and Laura do, however, argue that the Plaintiffs have no evidence that Brooks and Laura participated in a "malicious combination" to defraud the Plaintiffs However, there is evidence to the contrary.

As determined above, there are questions of material fact as to whether Brooks and Laura are primarily liable for alleged securities fraud and there are questions of material fact as to whether Brooks and Laura are liable for the alleged  securities fraud as control persons. Further, there is evidence that Brooks and Laura were spouses and that they both had financial interests in the success of VWE. From these alleged facts, a reasonable juror could conclude that Brooks and

Laura had a common understanding or design or shared conspirational objective to defraud the Plaintiffs. Therefore, there are questions of fact as to whether the Plaintiffs can satisfy the "malicious combination" element of a civil conspiracy claim.

Brooks and Laura also argue that they are entitled to summary judgment on the civil conspiracy claim because they are entitled to summary judgment on the underlying claims. Yet, as determined above, Brooks and Laura are not entitled to summary judgment on Plaintiffs' 10b-5 and fraud claims. Therefore, there are genuine issues of material fact and Brooks and Laura are not entitled to judgment as a matter of law on Plaintiffs' Sixth Cause of Action for civil conspiracy.

## X.    SEVENTH CAUSE OF ACTION: VIOLATION OF OHIO SECURITIES ACT

In Plaintiffs' Seventh Cause of Action, they alleged that Brooks and Laura violated the Ohio Securities Act, Ohio Rev. Code § 1707.44(B), (C)(1), (D), (F) and (G). Ohio securities laws are evidence of Ohio's interest in protecting its citizens by making certain requirements of investment arrangements before and when they are distributed in Ohio. *Bernie v. Waterfront Limited Dividend Housing Association*, 614 F. Supp. 651, 655 (S.D. Ohio 1985).

The relevant portions of Ohio securities law prohibit making or causing to be made any false representation concerning a material and relevant fact in any oral statement for the purpose of selling any securities in Ohio. Ohio Rev. Code § 1707.44(B). This law also prohibits knowingly selling or causing to be sold any security which has not been registered and is not exempt from registration. Ohio Rev. Code § 1707.44(C)(1). In addition, Ohio securities law prohibits a person who is an officer, director or trustee of an issuer and who knows the issuer to be insolvent from selling any of the issuer's securities without disclosing the fact that the issuer is insolvent. Ohio Rev. Code § 1707.44(D). Finally, this law prohibits a person from selling the

securities of an insolvent issuer with knowledge that the issuer is insolvent and with intent to deceive. Ohio Rev. Code § 1707.44(F).

Brooks and Laura argue that Plaintiffs' Ohio securities claims cannot be applied to them and, in the alternative, that these claims are time-barred. The Plaintiffs respond that this Court has personal jurisdiction over both Brooks and Laura and that Plaintiffs' Ohio securities claims are not time-barred. The existence of personal jurisdiction must first be determined.

### A.    Relevant Law On Personal Jurisdiction

Federal courts apply the law of the forum state when determining whether personal jurisdiction exists. *Burnshire Development, LLC v. Cliffs Reduced Iron Corp.*, 198 F. App'x 425, 429 (6th Cir. 2006). The federal court must first determine if the law of the forum state, Ohio in this case, provides personal jurisdiction. *Id.* If so, the federal court must then determine if exercising personal jurisdiction comports with the Due Process Clause of the U.S. Constitution. *Id.*

When there is no evidentiary hearing, as is the case here, the plaintiff must make only a prima facie showing. *Id.* The evidence, when in conflict, is viewed in a light most favorable to the plaintiff. *Id.*

Brooks and Laura do not dispute whether Ohio law provides for personal jurisdiction over them. The analysis, therefore, becomes whether personal jurisdiction over Brooks and Laura on Ohio securities claims comports with the Due Process Clause.

For purposes of the Due Process analysis, there is a distinction between general and specific jurisdiction. *Youn v. Track, Inc.*, 324 F.3d 409, 417 (6th Cir. 2003). However, either one is an adequate basis for personal jurisdiction. *Id.*

General jurisdiction exists where the defendant's contacts with the forum state are

"substantial" and "continuous and systematic" so that the state may exercise personal jurisdiction even if the action does not relate to the defendant's contacts with the state. *Id.* at 418. Specific jurisdiction exists when the contacts giving rise to the jurisdiction relate to the claim that is before the court. *Id.*

The constitutional touchstone for specific jurisdiction is whether the non resident defendant purposefully established minimum contacts in the forum state such that he or she should reasonably anticipate being haled into court there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). Jurisdiction comports with the Due Process Clause where the contacts proximately result from actions by the defendant himself or herself that create a substantial connection with the forum. *Id.* Jurisdiction does not comport with the Due Process Clause when the contacts are random, fortuitous or attenuated or where they result from the unilateral activity of a third party. *Id.*

The Sixth Circuit has established a three part test for determining whether specific personal jurisdiction exists. Id. For specific personal jurisdiction to exist: (1) a defendant must purposefully avail itself of the privilege of acting in the forum state; (2) the cause of action must arise from the defendant's activities in the forum state; and (3) the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of personal jurisdiction over the defendant reasonable. *Morel Acoustics, LTD. v. Morel Acoustics USA, Inc.*, No. 3:04-CV-348, 2005 WL 2211306 at *5 (S.D. Ohio Sept. 7, 2005)(citing *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

The first prong of the *Southern Machine* test, termed the "purposeful availment requirement," ensures that a defendant will not be haled into a jurisdiction solely as a result of

"random," "fortuitous" or "attenuated" contacts. *Burger King*, 471 U.S. at 475. However, physical contacts are not necessary so long as a commercial actor's efforts are "purposely directed" toward a resident of the forum state. *Ricker v. Fraza/Forklifts of Detroit*, 828 N.E.2d 205, 211 (Ohio Ct. App. 2005). For example, the soliciting of insurance by mail, the transmission of radio broadcasts into the forum state and the sending of magazines and newspapers into the forum state to be sold there have all been considered to be an availment of the privilege to do business in the forum state. *Southern Machine*, 401 F.2d at 382. Yet, the existence of a contract, such as a debenture note, is not purposeful availment. *Healthcare Capital, LLC v. Healthmed, Inc.*, 213 F. Supp.2d 850, 860 (S.D. Ohio 2002.) Prior negotiations and contemplated future consequences along with the terms of the contract and the parties' actual course of dealing must be evaluated. *Healthcare Capital*, 213 F. Supp.2d at 860 (citing *Nationwide Mutual Insurance Co. v. Tryg International Insurance Co., Ltd.*, 91 F.3d 790, 795 (6th Cir. 1996)).

The second prong of the *Southern Machine* test is satisfied when the defendant's contacts are related to the operative facts of the case. *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002). Further, contacts include only those activities purposefully sought or initiated by the defendant. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980).

The third prong of the *Southern Machine* test is satisfied when the defendants have sufficient contacts with the forum state and the wrongs of which the plaintiff complains arise out of those contacts. *See Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir. 1998), *cert. denied*, 525 U.S. 810 (1998); *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1268 (6th Cir. 1996). In other words, a court may infer that the third prong of the *Southern Machine* test has been satisfied and the exercise of personal jurisdiction over the defendant is reasonable if the first two prongs are

-68-

satisfied. *Id.*

The Parties here cite several cases in support of their arguments. In one example, Due

Process was not offended when jurisdiction was found to exist over a non resident defendant

who was conducting a mail order business in the forum state and had issued insurance to a

resident of the forum state. *Travelers Health Association v. Commonwealth of Virginia*, 339 U.S.

643, 649 (1950). In another example, Due Process was not offended when jurisdiction was found

to exist over claims brought by non resident plaintiffs pursuant to Ohio security laws against a

non resident securities underwriting firm that sold securities of an Ohio company and had visited

the Ohio company several times in the process. *Corporate Partners, L.P. v. National*

*Westminster Bank PLC*, 710 N.E.2d 1144, 1150 (Ohio Ct. App. 1998). In another example, Due

Process was not offended when jurisdiction was found to exist in a securities case over a non

resident defendant who had contacted the Ohio plaintiff several times by phone and mail. *Bernie*,

614 F. Supp. at 654-55.[18] In yet another example, subjecting a non resident seller of securities to

Ohio securities law did not offend Due Process where the only contacts with Ohio were the

mailing of two letters and a subscription agreement to an Ohio resident.  *Martin v. Steubner*, 485

F. Supp. 88, 100 (S.D. Ohio 1979), *aff'd* 652 F.2d 652 (6th Cir. 1981), *cert. denied*, 454 U.S.

1148 (1982). However, Due Process was offended and jurisdiction not permitted over a non

resident bank whose only contact with Ohio was the mailing of loan documentation to an Ohio

resident. *First National Bank of Mt. Prospect v. Shenk*, Nos. 91 C 5736 and 91 C 5753, 1993

U.S. Dist. LEXIS 1172 at *13 (N.D. Ill. Feb. 2, 1993). While these cases are instructive, none are

---

[18]The *Bernie* court based its decision upon how the securities were marketed to an Ohio resident and on Ohio's interest in protecting its citizens with regard to the sale of securities in Ohio. *Bernie*, 614 F. Supp. at 654-55.

on point and the course of dealing and contemplated future consequences in this case must be analyzed.

**B.    Analysis of Personal Jurisdiction**

In this case, Brooks and Laura argue that they did not have contacts with Ohio and did not purposefully avail themselves of the benefits of Ohio and are, therefore, not subject to Ohio securities laws. The Plaintiffs respond that Brooks and Laura knew that Ohio residents were solicited to buy the debenture notes and that they both actively assisted VWE in selling the debenture notes to residents of Ohio.

As for general jurisdiction, the Plaintiffs identify various social visits to Ohio made by Brooks and Laura. However, social visits do not rise to the level of business contacts necessary to invoke general jurisdiction.[19] The analysis, therefore, turns to specific personal jurisdiction.

In this case, the Plaintiffs are residents of Ohio and Brooks and Laura are residents of New York. Further, the Plaintiffs were contacted in Ohio at various times by Victor, Maxine and Alicia via telephone and written communications, and there is no evidence that either Brooks or Laura visited Ohio with regard to the sale of the Debenture Notes to the Plaintiffs. (Ed. Dep. 19-20, 26, 56-57.)

The contacts with Brooks and Laura identified by the Plaintiffs took place outside of Ohio. However, there are factual allegations that these contacts regarding the Debenture Notes were directed toward Plaintiffs and are part of alleged course of dealing involving Brooks, Laura and the Plaintiffs and the Debenture Notes.

Also, Brooks and Laura were aware that the Plaintiffs owned Debenture Notes and were

---

[19]Ohio does not recognize general jurisdiction over non residents. *Signom v. Schenck Fuels, Inc.*, No. C-3-07-037, 2007 WL 1726492 at *3 (S.D. Ohio June 13, 2007).

residents of Ohio. They should have anticipated that making the alleged misrepresentations and/or omissions regarding the Debenture Notes might cause them to be haled into court in Ohio. The first prong of the *Southern Machine* test is satisfied.

The contacts with Brooks and Laura identified by the Plaintiffs are related to Plaintiffs' Ohio securities claim. While these contacts may have been initiated by the Plaintiffs, the responses allegedly given were not. Therefore, the second prong of the *Southern Machine* test is satisfied.

Plaintiffs have presented evidence that Brooks and Laura had sufficient contacts with Ohio and the wrongs of which the Plaintiffs complain arise out of those contacts. Further, Ohio has a significant interest in protecting its citizens by making certain requirements of investment arrangements before and when they are distributed in Ohio. Therefore, the third prong of the *Southern Machine* test has been satisfied and the exercise of personal jurisdiction over Brooks and Laura in this case is reasonable. Since Plaintiffs have made a prima facie showing regarding all three prongs of the *Southern Machine* test, the exercise of personal jurisdiction over Brooks and Laura on Plaintiffs' Ohio securities claims does not offend the Due Process Clause of the U.S. Constitution.

### C.   Time Limitations Under Ohio Securities Law

Brooks and Laura next argue that Plaintiffs' Ohio securities claims are time barred. The Plaintiffs respond that they are not.

Ohio securities laws provide that no action based upon or arising out of a sale may be brought more than two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the defendants were unlawful or more than five years from the date of such sale, whichever is the shorter period. Ohio Rev. Code § 1707.43. "The two-year

provision is based on notice and is an actual statute of limitations while the five-year provision is a statute of repose. *Cain v. Mid-Ohio Securities, Inc.*, Nos. 06CA008933 and 06CA008932, 2007 WL 2080553 at *2 (Ohio Ct. App. July 23, 2007). Ohio courts have interpreted the phrase "whichever is the shorter period" to mean whichever period expires first. *Cain*, 2007 WL 2080553 at *3; *Goldberg v. Cohen*, No. 01 CA 49, 2002 WL 1371031 at *6 (Ohio Ct. App. June 13, 2002); *Kondrat v. Morris*, 692 N.E.2d 246, 250 (Ohio Ct. App. 1997).

### 1.    Statute of Limitations

The discovery of the facts constituting the alleged violations in this case was made on June 2, 2004 and the Complaint was filed on January 26, 2005. Therefore, the complaint was filed within two years after Plaintiffs knew, or had reason to know, of the facts by reason of which the actions of Brooks and Laura were allegedly unlawful. The two-year statute of limitations is satisfied for Plaintiffs' Ohio securities claims.

### 2.    Statute of Repose

The dates of the alleged sales in this case range from January 1, 1989, to October 1, 2003. The claim was filed on January 26, 2005. Therefore, any sales that occurred on or after January 26, 2000, are not subject to the statute of repose. This includes sales made on December 12, 2000, October 1, 2001 and October 1, 2003. The five-year statute of repose bars claims for sales made prior to January 26, 2000. This includes the sales made on January 1, 1989, September 22, 1992, November 12, 1998, and February 17, 1998.

### 3.    Statute of Limitations Conclusion

None of Plaintiffs' Ohio securities claims against Brooks and Laura are barred by Ohio's two-year statute of limitations for bringing such claims. However, the claims regarding several of the sales of Debenture Notes are barred by Ohio's statute of repose for securities claims.

Sales of Debenture Notes that occurred on or after January 26, 2000, are not time-barred. These include sales made on December 12, 2000, October 1, 2001 and October 1, 2003. Having determined that some of Plaintiffs' Ohio securities claims are not time barred, the analysis turns to whether Plaintiffs have presented evidence that Brooks and/or Laura are liable under Ohio security laws.

**D.     Liability Under Ohio Security Laws**

Brooks' and Laura's final argument regarding Plaintiffs' Ohio securities claims is that they were not "sellers" of the Debenture Notes and are, therefore, not liable. Ohio securities law makes directors of a corporation liable for violations of the corporation unless the director had just and reasonable grounds to believe that the alleged statements to be true or the omissions of facts to not be material. *In re National Century Finanical Enterprises, Inc.*, 504 F. Supp.2d 287, (S.D. Ohio 2007)(citing Ohio Rev. Code § 1707.41(B)(1)). Further, Ohio securities law makes liable every person that has participated in or aided the seller in any way in making a sale. *Id.* (citing Ohio Rev. Code § 1707.43(A)). Liability extends to any person who participates or aids the sale of a security in any way, including "inducing the purchaser to invest." *Id.* (citing *Federated Management Co. v. Coopers & Lybrand*, 738 N.E.2d 842, 860 (Ohio Ct. App. 2000)).

The arguments presented and discussed above regarding Brooks and/or Laura as sellers are based upon the Securities Act of 1933. However, the determination of who is a seller for purposes of Ohio securities law is different.

The Plaintiffs have presented evidence from which a reasonable juror could conclude that Brooks and Laura aided in the sale of the Debenture Notes, including inducing the Plaintiffs to continue to invest in the Debenture Notes. The Plaintiffs have presented evidence that Brooks and Laura aided the sale of the Debenture Notes by making the alleged misstatements and/or

-73-

material omissions regarding the financial health of VWE which induced the Plaintiffs to continue to hold the Debenture Notes. In addition, Laura was a Director of VWE who allegedly knew that the statements and/or omissions were allegedly material and misleading.

### E.      Conclusion Regarding Plaintiffs' Ohio Securities Law Claims

Applying Ohio securities laws to Brooks and Laura does not offend the Due Process Clause of the U.S. Constitution. Further, the Debenture Notes sold after January 26, 2000, including the Debenture Notes sold on December 12, 2000, October 1, 2001 and October 1, 2003, are not time barred by the statute of limitations or the statute of repose set forth in Ohio securities law. Finally, there are genuine issues of material fact as to whether Brooks and/or Laura were sellers under Ohio securities law. Therefore, Brooks and Laura are not entitled to summary judgment on Plaintiffs Seventh Cause of Action for violation of Ohio securities law.

## XI.    PUNITIVE DAMAGES

The relief prayed for in the TAC includes punitive damages. However, punitive damages are not available for the alleged violations of the Security Act of 1933 (Section 12(a)(1) and 12(a)(2) and Section 15 claims), the Security Exchange Act of 1934 (10b-5 and Section 20 claims) and Ohio securities law. *Burkhart v. Allson Realty Trust*, 363 F. Supp. 1286, 1290 (N.D. Ill. 1973); *Byrley v. Nationwide Life Insurance Co.*, 640 N.E.2d 187, 200 (Ohio Ct. App. 1994).

Punitive damages are, however, available for common law tort claims such as fraud and conspiracy. *Motorists Mutual Insurance Co. v. Said*, 590 N.E.2d 1228, 1234(Ohio 1992); *Preston v. Murty*, 512 N.E.2d 1174, 1175 (Ohio 1987). Plaintiffs' fraud and conspiracy claims have survived summary judgment so further consideration is necessary.

To establish a claim for punitive damages, the plaintiff must show, in addition to proving the elements of the tort itself, that the tort was aggravated by the existence of malice or ill will or

-74-

must show that the wrongdoing is particularly gross or egregious. *Davis v. Sun Refining and Marketing Co.*, 671 N.E.2d 1049, 1060 (Ohio Ct. App. 1996). The Ohio Supreme Court has defined actual malice as:

> (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

*Motorists Mutual*, 590 N.E.2d at 1234. To obtain punitive damages, the probability of harm occurring must be great and the possible harm must be substantial. *Id.*

The amount of punitive damages to be awarded, if any, rests largely within the determination of the trier of fact. *Zoppo v. Homestead Insurance* Co., 644 N.E.2d 397, 401 (Ohio 1994); *Roar v. Rydell*, Nos. C-061090 and C-070032, 2007 WL 4463965 at *9 (Ohio Ct. App. Dec. 21, 2007). The Ohio Supreme Court has also noted that "it is rarely possible to prove actual malice otherwise than by conduct and surrounding circumstances." *Villella v. Waikem Motors, Inc.*, 543 N.E.2d 464, 466-67 (Ohio 1989)(citing *Davis v. Tunison*, 155 N.E.2d 904, 907 (Ohio 1959), overruled on other grounds in *Moskovitz v. Mt. Sinai Medical Center*, 635 N.E.2d 331 (Ohio 1994))

"[A]ctual malice may be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross." *Id.* at 467. Even if actual malice is not shown, actions that are particularly gross or egregious, such as intentionally made misrepresentations, may support an award of punitive damages. *Smith v. General Motors Corp.*, 859 N.E.2d 1035, 1042 (Ohio Ct. App. 2006).

For example, an insured may maintain an action for punitive damages if the insured shows that the insurer's bad faith was accompanied by a dishonest purpose, actual intent to mislead or deceive the insured, or a calculated scheme to defeat the insured's action. *Motorists*

*Mutual*, 590 N.E.2d at 1235. In another example, punitive damages may be awarded where evidence established that the non removal of potentially contaminated piping displayed a conscious disregard for the safety of others. *Davis*, 671 N.E.2d at 1060.

In this case, Brooks and Laura argue that there is no basis for a recovery of punitive damages. The Plaintiffs do not offer legal argument otherwise but do offer facts from which a juror could reasonably conclude that Brooks and/or Laura consciously disregarded Plaintiffs' rights to know the actual financial status of VWE and actually intended to mislead or deceive the Plaintiffs with regard to the actual financial status of VWE.

Plaintiffs are not entitled to punitive damages on their alleged violations of the Security Act of 1933 (Section 12(a)(1) and 12(a)(2) and Section 15 claims), the Security Exchange Act of 1934 (10b-5 and Section 20 claims) and Ohio securities law as a matter of law. However, the factual allegations set forth by the Plaintiffs combined with the axiom that it is generally for the finder of fact to determine the amount, if any, of a punitive damage award leads to the conclusion that there are genuine issues of material fact with regard to whether Plaintiffs are entitled to damages on their fraud and conspiracy claims.

## XII SUMMARY

Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' First Claim for Relief for violation of Sections 12(a)(1) and 12(a)(2) of the Securities Act of 1933 is GRANTED. Plaintiffs' Section 12(a)(1) claims and all but one of Plaintiffs' Section 12(a)(2) claims are time barred. Also, there are no genuine issues of material fact and Plaintiffs have not shown that either Brooks or Laura were "sellers" in accordance with the law regarding Section 12(a)(1) and 12(a)(2) claims.

Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Second Claim for

Relief for violation of Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5 is GRANTED IN PART and OVERRULED IN PART. Sales made before January 26, 2000, are timed barred and sales that occurred on or after January 26, 2000, are not. Further, there are genuine issues of material fact as to whether the statements made by Brooks and/or Laura are actionable and as to whether Brooks and/or Laura acted with the requisite scienter.

Brooks' and Laura's Motions for Summary Judgment on Plaintiffs Third and Fourth Claims for Relief for violation of Section 15 of the Securities Act of 1933 and Section 20(a) of the Securities Exchange Act of 1934 are OVERRULED. There are genuine issues of material facts as to whether Brooks and/or Laura were control persons under the applicable law.

Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Fifth Cause of Action for fraud are OVERRULED. There are genuine issues of material fact as to whether the oral statements and omissions attributed to Brooks and Laura were material, as to whether Brooks and/or Laura had a duty to disclose and as to whether Brooks and/or Laura acted with the requisite scienter.

Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Sixth Cause of Action for civil conspiracy are OVERRULED. There are genuine issues of material fact as to whether the Plaintiffs can satisfy the "malicious combination" element of a civil conspiracy claim and Brooks and Laura are not entitled to summary judgment on the remaining underlying claims .

Brooks' and Laura's Motions for Summary Judgment on Plaintiffs' Seventh Cause of Action for violation of Ohio securities laws is OVERRULED. Application of Ohio securities law to Brooks and Laura in this case is not offended by the Due Process Clause of the U.S. Constitution. Further, Debenture Notes sold after January 26, 2000, including those sold on

December 12, 2000, October 1, 2001 and October 1, 2003, are not time barred. Finally, there are genuine issues of material fact as to whether Brooks and/or Laura were sellers under Ohio securities law.

Finally, Brooks' and Laura's Motion for Summary Judgment on Plaintiffs' prayer for punitive damages is GRANTED IN PART and OVERRULED IN PART. Plaintiffs are not entitled to punitive damages on their alleged violations of the Security Act of 1933 (Section 12(a)(1) and 12(a)(2) and Section 15 claims), the Security Exchange Act of 1934 (10b-5 and Section 20 claims) and Ohio securities law as a matter of law. However, there are genuine issues of material fact as to whether Plaintiffs are entitled to punitive damages on the remaining fraud and civil conspiracy claims.

Plaintiffs' 10b-5, control person liability and Ohio securities law claims on sales of Debenture Notes that occurred on or after January 26, 2000 remain to be adjudicated. Plaintiffs common law fraud and civil conspiracy claims also remain to be adjudicated.

Finally, Plaintiffs have moved for oral argument on Brooks' and Laura's Motions for Summary Judgment. (Doc. #154.) However, the Court has been able to review the thousands of pages of argument and evidence submitted by the Parties and can fairly resolve the Motions based upon these submissions without oral argument. Therefore, Plaintiffs' Motion for Oral Argument is OVERRULED.

**DONE** and **ORDERED** in Dayton, Ohio, this Seventh day of January, 2008.

**s/Thomas M. Rose**

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record